# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
February 14, 2006 Session

## STATE OF TENNESSEE v. MARK A. SCHIEFELBEIN

**Appeal from the Circuit Court for Williamson County**
**No. I-1102-427     Russ Heldman, Judge**

**No. M2005-00166-CCA-R3-CD and**
**No. M2005-02370-CCA-R10-CO**
**Filed February 8, 2007**

A Williamson County Circuit Court jury convicted the defendant, Mark A. Schiefelbein, of seven counts of aggravated sexual battery and one count of especially aggravated sexual exploitation of a minor. The trial court imposed a 12-year sentence for each conviction and ordered consecutive service, thereby yielding an effective sentence of 96 years. Aggrieved of the convictions and sentences, the defendant appeals and raises the following issues: (1) the trial court erred by failing to require the State to furnish discovery materials to the defendant; (2) the trial court committed reversible error by configuring courtroom seating to shield the public from viewing certain exhibits; (3) the trial court improperly instructed the jury, sua sponte, to disregard certain truthful testimony of the defendant; (4) the trial court's repeated questioning of State's witnesses created an appearance of judicial bias and improperly bolstered the State's case; (5) the trial court committed reversible error in excluding defense-proffered medical testimony that a physical examination of the victim rebutted the occurrence of sexual penetration, contact, or injury; (6) the trial court permitted the introduction of inadmissible and highly prejudicial hearsay and opinion testimony; (7) the trial court erroneously permitted the State to examine the defendant about his knowledge that a "voice stress analysis" could detect stress in an individual's voice; (8) the trial court erroneously instructed the jury that the defendant could be guilty of aggravated sexual battery if he acted intentionally, knowingly, or "recklessly"; (9) the trial court erroneously instructed the jury that the State could prove the mental state for aggravated sexual battery in the disjunctive by showing that the defendant acted intentionally, knowingly, "or" recklessly; (10) the trial judge should be disqualified from further involvement in the case; and (11) the defendant's effective sentence is excessive, illegal, and unconstitutional. As an adjunct to the issues raised on direct appeal, the defendant also pursues Appellate Procedure Rule 10 interlocutory review to bar future prosecution of three related child-rape charges that were severed, over his objection, from trial of the aggravated sexual battery and especially aggravated sexual exploitation of a minor offenses. After thorough review of the record and careful consideration of the parties briefs, their oral arguments, and the applicable law, we hold that none of the errors require reversal of the defendant's convictions for aggravated sexual battery or for aggravated sexual exploitation of a minor. However, we hold that the incarcerative 96-years' sentence is inconsistent with the purposes and principles of sentencing and does not provide a fair sense of predictability of the criminal law and its sanctions; therefore, we modify the defendant's

effective sentence from 96 years to 36 years. We order that the trial judge who presided at trial is disqualified from conducting any further proceedings in this cause. Finally, we dismiss the child-rape offenses, as improperly severed, and hold that further prosecution on such charges is barred by principles of double jeopardy.[1]

**Tenn. R. App. P. 3 & 10; Judgments of the Circuit Court are Affirmed in Part as Modified; Reversed in Part.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined. GARY W. WADE, P.J., not participating.

David L. Raybin, Nashville, Tennessee (on motion for new trial and on appeal); and Patrick Johnson, Nashville, Tennessee (at trial), for the Appellant, Mark A. Schiefelbein.

Robert E. Cooper, Jr., Attorney General & Reporter; Benjamin A. Ball, Assistant Attorney General; Ronald L. Davis, District Attorney General; and Mary Katharine White, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On November 12, 2002, the Williamson County Grand Jury indicted the defendant on three counts of child rape, *see* T.C.A.[2] § 39-13-522 (2006) ("Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age."), seven counts of aggravated sexual battery, *see id.* § 39-13-504(a)(4) ("Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: . . . (4) The victim is less than thirteen (13) years of age."), and one count of especially aggravated sexual exploitation of a minor,[3] *see id.* § 39-17-1005 ("It is unlawful for a person to knowingly promote, employ, use, assist, transport or permit a minor to participate in the performance or in the production of material which includes the minor engaging in: (1) Sexual activity; or (2) Simulated sexual activity that is patently offensive."). All charged offenses involved the same victim.

---

[1]We remand for clerical correction one of the judgments. *See* Footnote 3.

[2]The definitive style guide for legal citation in the United States is THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION (Columbia Law Review Ass'n et. al. eds., 18th ed. 2005). The current 18th edition directs that local citation rules take precedence over *Bluebook* rules. For Tennessee, THE BLUEBOOK references "Tenn. Code Ann. § 1-2-101(a) (2003) ('cite as')." That Code section provides as follows: "This compilation of the laws of the state is to be designated as the 'Tennessee Code' and the annotated edition of the code provided for by chapter 1 of this title shall be designated as 'Tennessee Code Annotated' and abbreviated and cited 'T.C.A.'" Henceforth, the author of this opinion will employ "T.C.A." in citation sentences and citation clauses.

[3]The indictment and the judgment list the incorrect code section for this charge. They list section 39-17-105 instead of section 39-17-1005. *See* T.C.A. §§ 39-17-105 (charge for use of public toilet facility prohibited), -1005 (2006). On remand, the trial court shall amend this judgment.

On July 7, 2003, the first day of trial, the State moved to sever the three child rape counts. The trial court granted the motion, over defense objection, and five days later, the jury convicted the defendant of the remaining charges. Following the sentencing hearing, the trial court sentenced the defendant to an effective incarcerative sentence of 96 years. The defendant filed a timely notice of appeal.

Viewed in the light most favorable to the State, the proof at trial showed that B.R.,[4] born June 15, 1990, practiced gymnastics at Let It Shine Gymnastics in Franklin, Tennessee, where she was coached by the defendant. When the defendant opened his own gymnasium, Esprit Gymnastics,[5] in late 2000, B.R. and five other female students left Let It Shine Gymnastics to continue under the defendant's tutelage. The defendant referred to these 6 students as his "six pack."

B.R. testified that she was the defendant's "favorite" student, and he developed a close social relationship with B.R.'s family. He regularly joined them for dinner, movies, hockey games, holidays, and church services. The defendant received Christmas and birthday presents from the victim's family, and he bought presents for B.R., her mother, and her younger sister. B.R. testified that she had received other gifts from the defendant, and her fellow students "start[ed] not liking [her] and it made [her] sad."

During the summer of 2001, B.R. practiced gymnastics five days a week, and the following school year, she practiced four days a week. Typically, B.R. would wake at 6:15 a.m., and she would attend school from 8:30 a.m. until 3:15 p.m. Afterwards, she would practice gymnastics for approximately five hours, until approximately 9:00 p.m. when she would go home, complete her homework, and retire to sleep at 11:00 p.m.

The State's evidence showed that all of the charged offenses occurred during B.R.'s practice sessions at the gymnasium between the summer of 2001 and September of 2002. Evidence described Esprit Gymnastics's gymnasium and office layouts. The victim testified that the defendant touched her vagina while she was stretching on the "regular" floor[6] and on the rod floor, and he touched her breasts and made her touch his penis while they were in his office. B.R. explained that the majority of the touching took place on the rod floor. The rod floor is approximately one foot higher than the concrete regular floor, and carpet separates it from the concrete. B.R. said, "[I]t's . . . a strip of floor[,] and it is very bouncy and easier to tumble on." B.R. and other State witnesses

---

[4]To protect the identity of minor victims of sex crimes, it is the policy of this court to refer to the victims by their initials.

[5]The trial transcripts incorrectly refer to Esprit Gymnastics as "Espirit Gymnastics." We will use the correct spelling "Esprit."

[6]We glean from the record that the "regular" floor is the large floor marked with boundary lines where gymnasts perform tumbling and floor exercises.

testified that a cabinet stood in an opening in the office wall.[7] From the parent-viewing area, individuals could see into the office through this opening if they leaned over the cabinet. The office also had a door.

B.R. stated that six to seven other students were present without their parents when the defendant touched her. The defendant stretched the students in a certain order, and he stretched them behind a purple and white mat. In the beginning, the defendant stretched B.R. first, but then he started stretching her last. She explained that on some occasions, he would stretch her twice, before and after the other students. She stated that the defendant would touch her after he stretched the other students and while the other students performed exercises on the bars and the trampolines.

B.R. recounted that the defendant first touched her vagina, over her leotard, while she was doing a frog stretch.[8] He pressed his hand onto her buttocks during the stretch and placed his fingers between her legs, onto her vagina. B.R. gave various estimates of the number of times she was touched. At trial she testified that the defendant touched her in this fashion over her leotard eight to 10 times. B.R. also stated that he touched her under her leotard during this stretch "a bunch of times." She recalled telling Brentwood Police Department Detective Adrian Breedlove, the case's lead detective, that the defendant had touched her vagina under her leotard approximately 30 times. She explained at trial that she was "distraught" during the interview with Detective Breedlove, and the defendant touched her under her leotard 15 to 17 times.

The defendant also touched B.R.'s vagina and had her pull aside her leotard during the straddle stretch[9] while she was training for level seven[10] competitions. She testified that the defendant told her that he needed to see her vagina so he would know where not to touch her. B.R. complied because the defendant "gets really mad very easily." After she would pull her leotard aside, he then asked to touch her vagina to determine how it felt, so he would not touch her again. B.R. stated that she allowed him to touch her "[b]ecause he would get angry and [she] was his favorite and [she] didn't want him angry at [her]." B.R. and the defendant would then negotiate how many seconds he could touch her vagina, but he would count very slowly to extend the actual

---

[7] B.R. testified that this opening was "patched . . . up." During the defendant's proof, Rob Tallman, a home builder, testified that the defendant asked him in June of 2002 to fill in the opening. He stated that in late August or early September the defendant enclosed the opening and asked him to finish the drywall.

[8] We discern from the record that for a frog stretch, a gymnast lies on his or her stomach and puts his or her feet together. The knees splay to each side of the body, and the goal is for the entire body to be flat against the floor. B.R. demonstrated this stretch for the jury.

[9] We discern that for a straddle stretch, a gymnast sits with his or her legs in a V-shape. The goal of this stretch is to have the legs wide and straight to the floor. B.R. also demonstrated this stretch for the jury.

[10] B.R.'s mother testified that B.R. began training for level seven in the summer of 2001. B.R. testified that the sport of gymnastics is organized into 10 levels. Gymnasts begin competing at level four, and as they master harder skills, they compete at higher levels. The elite level exceeds the tenth level, and at this stage, gymnasts possess the skills necessary to compete in the Olympic Games.

touching time.  B.R. testified that he touched her with his "pointer finger," and she mimicked his finger's movement for the jury.

During the straddle stretch, the defendant would ask B.R. to rate on a scale of one to 10 how the touching made her feel.  At first, B.R. told the defendant "zero because it didn't feel good to [her].  It made [her] feel violated."  When the defendant accused her of lying, she provided a number to prevent him from becoming angry.  B.R. explained that the defendant touched her vagina "basically every time" she did the stretch.

B.R. testified that the defendant routinely videotaped the students' "tricks," and he videotaped B.R.'s vagina twice while she did the straddle stretch.  On the first occasion, he told B.R. that he had an idea that she would hate.  Then he asked her if he could videotape her vagina, and she "finally gave in because [she] didn't like him being angry at [her]."  The defendant directed B.R. to pull aside her leotard, and he placed the camera on the rod floor, positioned it in front of her, and videotaped her vagina.  After this first videotaping, the defendant claimed that the previous tape "didn't turn out" and that he needed to videotape her a second time.  He told B.R. that he needed to move her leotard.  At first, she refused, but eventually, she pulled her leotard aside.  After she moved her leotard, the defendant adjusted its position, and B.R. held it in place.  The defendant placed the camera on the rod floor and videotaped himself touching B.R.'s vagina.  She testified that his finger was "shaky."  Sometime later, the defendant assured B.R. that he had destroyed these videotapes.  He told her that he burned the film in a tuna can, and he smashed the remaining plastic parts with a hammer.  He then threw the tuna can and the plastic in the trash.

After Thanksgiving of 2001, the defendant made B.R. touch his penis twice in the same day.  B.R. stated that these incidents occurred in the winter because she remembered the defendant wearing "black squishy pants," and he only wore long pants in the winter.  She remembered telling Detective Breedlove that the defendant wore "quilted shorts" when this occurred, but she testified at trial that now she "remember[s] clearly it was black pants."  First, while near the uneven bars, the defendant asked B.R. to put her hand in his pocket because he had a "treat" for her.  She refused, but later, while in his office, he made B.R. put her "hand in his pocket and squeeze his penis."  The second time the defendant made B.R. touch his penis was later that same day.  After he went to the restroom, he went to his office and called for B.R.  She testified that she did not want to go into his office "because [she] thought something like that was going to happen."  When she entered the office, the defendant exposed his penis.  B.R. turned her head, and the defendant said, "You can touch it and squeeze it."  B.R. told the defendant that she did not want to touch his penis, but he grabbed her hand and made her touch it.  She demonstrated for the jury the motion that the defendant instructed her to make.  She stated that the defendant's penis looked "swollen," "purple," and "red," and it felt "hard" and "squishy."[11]

The defendant later apologized to B.R.  He told her that he would buy her anything she wanted because he made her touch his penis.  B.R. told him that she wanted a teddy bear, but

_____

[11]The record is unclear whether the office door was closed during these offenses.

-5-

she testified that she "was just kidding." The defendant gave B.R. a teddy bear, and B.R. told her mother that he gave it to her for helping coach other students.

In May 2002, the defendant touched B.R.'s breasts. She remembered that it was May because her mother noticed that she was starting to develop breasts on May 1. Her mother told her to remember this important date and to tell the defendant about her development. When B.R. told the defendant, he asked to see and touch her breasts. While in the defendant's office with the door closed, B.R. pulled her leotard aside, and the defendant touched her breasts. B.R. explained that her back was to the door and that the defendant was facing her.

In June 2002, B.R. began complaining of back pain. In the evenings, B.R.'s mother would place ice on B.R.'s back and give her Advil. B.R. continued to practice gymnastics during the following weeks although her back pain did not subside. B.R.'s mother testified that B.R. had "a couple of especially hard workouts," and she testified to one in particular. On July 1 or 2, the defendant telephoned B.R.'s mother and told her that B.R. needed to quit gymnastics because B.R. would not follow his instructions. She spoke with B.R. that evening, and B.R. told her that the defendant became angry when she refused to do back handsprings on the high beam because her back hurt. The defendant became enraged and left the gymnasium for approximately one and one-half hours. A 17-year-old gymnast supervised the students in his absence. B.R. informed her mother that she did not enjoy gymnastics and that she wanted to quit. B.R. testified that the touching was the real reason she wanted to quit.

B.R.'s mother admitted that she enjoyed watching her daughter practice gymnastics and compete, but she testified that she supported B.R.'s decision to quit. Therefore, she called the defendant the next day and told him that B.R. would not be attending practice and wanted to quit gymnastics. That evening, the defendant and Mia Yabut, B.R.'s friend and practice partner, drove to B.R.'s home in the tumble bus.[12] B.R. joined them in the tumble bus, and B.R. told the defendant she wanted to quit because she no longer enjoyed practicing gymnastics. B.R. testified that the defendant made Miss Yabut leave the bus and then asked if she wanted to quit because he was touching her. She confirmed that the true reason for quitting was the touching. The defendant told B.R. that he would not touch her again. At some point, the defendant and B.R. went inside the house. B.R., her mother, and the defendant went to B.R.'s bedroom. The defendant begged B.R. not to quit gymnastics, and he cried. No decision was reached at that time.

Later in July, the defendant, B.R., and her parents met at the gymnasium again to discuss whether she would quit. B.R.'s mother testified that she wanted B.R. "to quit for the right reason." She did not want B.R. to quit because she was scared to do a trick or had a bad practice. B.R.'s mother testified that at the meeting, B.R. was "defiant, like [she] had never seen her before." B.R. testified that her mother encouraged her to try again. Her mother left the office because she was frustrated regarding B.R.'s defiant behavior and wanted her daughter to quit for, what she

---

[12]According to the defendant's testimony, a tumble bus is a school bus with removed seats and miniature gymnastics equipment.

-6-

considered, an "appropriate reason." At this meeting, they failed to decide whether B.R. would continue practicing gymnastics.

While the defendant, B.R., and her parents continued to discuss B.R.'s involvement with gymnastics, a doctor examined B.R.'s back. The doctor determined that B.R. had fractured the L-5 vertebrae, and he prescribed that she wear a back brace for at least three months. The doctor later extended the time to four months. While B.R. wore the brace, she did not practice gymnastics. Instead, she worked sporadically at the gymnasium concession stand.

On September 7 or 8, 2002, the defendant went to B.R.'s house for dinner. After dinner, the defendant, B.R., and her two sisters searched for the family dog. During the search, B.R.'s oldest sister told the defendant that B.R. thought a certain young boy was cute. The defendant teased B.R., and she struck him in the head. B.R. explained at trial that she hit him because of the teasing and her pent-up anger from the touching.

After finding the dog and returning to the house, the defendant told B.R.'s mother that he was "extremely angry" with B.R., that she had hit him, and that he was going to leave "before he lost his cool." B.R.'s mother testified that she asked B.R. why she struck the defendant and why the defendant grew angry at B.R. "over seemingly insignificant things." B.R. told her mother that she had many reasons for hitting the defendant. Finally, B.R.'s mother asked, "[I]s he touching you inappropriately?" B.R. answered that he had touched her inappropriately. At trial, B.R. testified, over objection, that after she told her mother, her mother commented that "she kind of felt like something like that was going on."

B.R.'s mother testified that she hugged B.R. and told her that it would never happen again. When she asked, B.R. where the defendant touched her, B.R. replied, "[h]er private spot." B.R. testified that she finally told her mother "[b]ecause [she] couldn't bear having it inside [her]." She stated that on several occasions, the defendant would tell her not to tell anyone because he "would get in trouble." B.R. believed she would "get in trouble for telling because [she] thought he would get angry at [her]."

The next morning B.R.'s parents contacted the police. B.R. and her parents met with Detective Breedlove at the Brentwood Police Department on September 10, 2002. Detective Breedlove conducted B.R.'s interview in a conference room equipped with video and audio recording devices, which he used to record the interview.[13] B.R.'s parents observed the interview on a closed circuit television. B.R.'s mother testified, over objection, that "[she] knew that [B.R.] was being totally honest. [B.R.] was telling [Detective Breedlove] exactly what happened." She further testified that B.R. acted "somber," but at times, she acted "silly, . . . not like herself at all."

---

[13]The videotape was shown to the jury during Detective Breedlove's direct examination testimony.

Detective Breedlove described B.R.'s demeanor as sometimes being "happy" and "friendly," but she then acted "stoic" and "flat." B.R. looked down and softened her voice when she described "sensitive subjects," and she "shudder[ed]" while describing certain incidents.

Detective Breedlove attended a second interview with B.R. Over objection, he testified that B.R.'s statements during the interviews and at trial regarding where the defendant touched her, when he touched her, and where she was while the defendant touched her were consistent. He explained that B.R. did not remember dates or the specific number of times the defendant touched her vagina, but she never wavered from her story.

Detective Breedlove testified on cross-examination that although B.R. varied the number of times that the defendant touched her vagina, he believed her testimony was consistent for a child. Detective Breedlove admitted that B.R. made a mistake when she told him that the defendant was wearing shorts when he exposed his penis. Detective Breedlove stated that after that mistake, B.R. consistently stated that the defendant was wearing black pants. He agreed, however, that B.R.'s testimony was "fairly inconsistent" regarding whether the defendant held the video camera or whether it was on the ground while he filmed B.R.'s vagina in the straddle-stretch position.

Subsequent to the September 10, 2002 interview, Detective Breedlove obtained search warrants for Esprit Gymnastics and the defendant's residence. On the evening of September 11 and prior to executing the warrants, Detective Breedlove visited B.R.'s home. With her parents' permission, B.R. agreed to place a "perp phone call" to the defendant. Detective Breedlove testified that the purpose of the telephone call was to gather information and possibly an admission from the defendant. In the presence of her parents and Detective Breedlove, B.R. telephoned the defendant at the gymnasium, and Detective Breedlove recorded the conversation.

During Detective Breedlove's testimony, the State played the recorded conversation for the jury and entered a transcript of the conversation into evidence. During this conversation, B.R. told the defendant that she was worried about him touching her "private spots." The defendant responded, "No, I'm not going to do that." B.R. also told the defendant that she was worried about the videotapes. The defendant stated, "There [are] no video tapes." The two then argued over whether there are tapes of her "private spot." Then, the defendant stated, "I have no idea what you're talking about . . . ." B.R. replied, "You, just promise me you destroyed them, okay?" The defendant stated, "Whatever." After this response, they changed the subject, and at one point, the defendant spoke with B.R.'s mother. He failed to mention B.R.'s allegations. Eventually, the defendant spoke with B.R. again, and the telephone conversation ended without further discussion of the offenses.

After recording the telephone conversation, Detective Breedlove and other Brentwood Police Department personnel executed the search warrant first on Esprit Gymnastics and then on the defendant's residence. Initially, the defendant gave his consent to search the gymnasium, but he later revoked consent. Detective Breedlove produced the warrant, and the police searched the

gymnasium. After this search, the defendant followed the police to his residence, and it was searched.

The police seized approximately 79 videotapes from the gymnasium and the defendant's residence. Detective Breedlove and two members of Project Alert,[14] viewed all 79 tapes. None of the 79 videotapes contained footage of B.R.'s uncovered vagina made while she performed the straddle stretch. Of the 79 videotapes, 25 were digital VHS tapes. Detective Breedlove testified that the 25 digital tapes contained practice routines of the defendant's students. Five of the 25 digital tapes, labeled A through E, focused on B.R.; the defendant focused the camera on "all three . . . of the victim's private areas." Detective Breedlove stated that the defendant "zoomed" the camera in on B.R.'s clothed vaginal area more than 200 times. He explained that some shots occurred when B.R. did a gymnastic skill, but many times, the defendant "zoomed" in on B.R.'s vaginal area when she was not doing anything of a "gymnastics nature."

In tape A, the defendant "zoomed" the camera in on B.R.'s vaginal area 81 times. In tape B, he focused on her vaginal area 84 times. In one of the 84 shots, B.R. was pushing a mat underneath another student doing a skill on the trampoline. At this point, her legs obstructed a view of her vaginal area. Detective Breedlove testified that as the defendant "zoomed" in on B.R., he stated her name and that she "better get that in, you're totally blowing it now." She placed the mat a couple more times, and the defendant stated her name again and said "hang on to the mat and get it in like you used to, please." B.R. changed positions making her vaginal area visible, and the defendant said, "better, thank you" and then stated the victim's name. Detective Breedlove testified that during another shot of B.R. on tape B, while she was lying down, the defendant was distracted by someone. He told the person to "give [him] a second" as he "zoomed" the camera in on B.R.'s vaginal area. Detective Breedlove testified that the defendant focused on B.R.'s vaginal area 69 times in tape C, five times in tape D, and three times in tape E.

At trial, Lucy Fox, a judge and member of USA Gymnastics, the country's gymnastics governing body, reviewed several portions of videotape A. Referring to the "handstand straddle down" position, she stated that there is no gymnastic purpose for "zooming in" on the gymnast's vaginal area. She asserted that there was no gymnastic purpose for focusing on the gymnast's vaginal area when she pushed the mat under another gymnast who was flipping on the trampoline. Ms. Fox continually asserted the lack of any gymnastic purpose for each of the scenes she viewed.

Regarding spotting and stretching techniques, Ms. Fox explained that professional members of USA Gymnastics must pass a safety certification test based upon the *USA Gymnastics Safety Handbook*. The *Handbook* lists regulations for equipment and spotting techniques. Ms. Fox read the *Handbook*'s "Hand Spotting" section into the record.

---

[14]Project Alert is a section of the National Center for Missing and Exploited Children. The members are mainly retired law enforcement officers. This organization assists police departments with investigations.

Hand spotting refers to a method of spotting where a coach places his or her hands on the gymnast, and lifts and manipulates and/or supports the gymnast in mastering a skill. Warning and consent documents should refer to the act of hand spotting and what it means. All spotting should result in minimal touching support, and athletes should be informed about the potential for touching while being spotted. Unnecessary touching should not be used particularly when the spotter is male and the gymnast is female. Gymnast and parents should be aware that from time to time a slip may occur and the gymnast will be touched on the buttocks, crotch or chest. The coach and gymnast should understand such touching is at a minimum and should not occur repeatedly.

If the coach or instructor accidentally touches one of these areas, he/she should be sensitive to the situation and indicate that the touch was an accident by a brief apology and then return to instructions. When a coach/instructor is performing a rescue type spot, then concern about touching a private area is obviously trivial in comparison to the consequence of the unprotected fall.

Ms. Fox also explained that the private parts, the crotch, buttocks, and chest, are "no zones." She stated that there is no reason to touch the no zones, except possibly for a rescue spot. Rescue spotting is when the coach will "grab" the gymnast to protect him or her from injury. The coach prevents the gymnast from hitting his or her head, or the coach stops the gymnast's rotation.

Ms. Fox further explained how a gymnast performs a frog stretch, and she demonstrated the proper placement of the coach's hands while hand spotting in the stretch. She stated that "[n]o coach should place [his or her] fingers . . . between an athlete's legs." She testified that frog stretching is not related to rescue spotting.

Ms. Fox also testified that a coach should not place his or her fingers between a gymnast's legs while the gymnast performs the straddle stretch. She stated that the coach's fingers should be placed "towards [the gymnast's] legs diagonally or . . . straight up towards [the gymnast's] head along [his or her] back." The hands should never rest on the inner thigh area.

On cross-examination, Ms. Fox explained that when a gymnast performs the frog stretch, a coach should place his or her hand "midway down [the gymnast's] tush," but "not cupping [the gymnast's] tushes." She stated that this is an exception to the "no zone" rule, but a coach should never touch the vaginal area of a student. Ms. Fox explained that TOPS testing, testing for gymnasts training for the elite track, examines gymnasts' strength and flexibility. During this testing, coaches take several measurements, one being from the gymnast's hip bone to the floor while in a split. She admitted that the coach touches the vaginal area, the hip bones, but the coach does not touch the vagina or the inner thigh. Ms. Fox testified that pictures of the cat leap position would show the

crotch area, but it would also show the legs and feet for positional purposes. Finally, she stated that neither a student nor a coach would benefit gymnastically from watching videotapes that only show a gymnast's crotch.

On October 2, 2002, personnel at Our Kids Center evaluated B.R. Phyllis Thompson, a licensed social worker, testified at trial. She obtained B.R.'s medical history and explained the process of the medical examination. Ms. Thompson stated that this initial interview dictates the invasiveness of the physical examination.

Ms. Thompson testified that B.R. told her that she was having nightmares about the defendant. When Ms. Thompson asked her what the defendant did to her, B.R. replied that he touched her "private spot" many times. B.R. further stated that the defendant touched "the part she pees from - with his finger." B.R. was unsure whether he touched the inside or outside of her vagina. Ms. Thompson testified that B.R. stated that she felt pain when the defendant touched her "private spot," but B.R. did not bleed during or after the contact.

B.R. told Ms. Thompson that the defendant touched her breasts and made her touch his penis. She demonstrated the motion that she made during the contact and stated that nothing came out of the defendant's penis. Ms. Thompson testified that she failed to ask B.R. if she saw the defendant's penis.

After the grand jury indicted the defendant, Detective Breedlove, accompanied by other officers, arrested him at Esprit Gymnastics.

At trial, the defendant called seven witnesses, including the victim, and he testified on his own behalf. Three witnesses, Edmund Yabut, M.D., Dee Ann Melton, and Michelle Day, whose children practiced under the defendant, testified concerning the defendant's good character. They also described his coaching style as "aggressive," "intense," or "devoted" and explained that the defendant did not have a policy that limited parents' access to the gymnasium floor or the defendant's office. Defense witness, Rob Tallman, who also was a parent of a student, testified concerning the opening in the defendant's office wall. In addition, the defendant called Brentwood Police Department Corporal Melissa Westbrook, who conducted the initial interview of the victim. Mia Yabut, Edmund Yabut's daughter and B.R.'s practice partner, testified on the defendant's behalf.

The defendant testified that he moved to Tennessee from California after accepting a job as the director of the girls' team program at Let It Shine Gymnastics. While coaching at Let It Shine, he moved B.R. into his training group, and soon after the regrouping, he met B.R.'s family.

After coaching six months at Let It Shine Gymnastics, the defendant was fired, according to him, because he and the owner disagreed over the running of the girls' team program. Instead of returning to California, the defendant opened his own gymnasium, Esprit Gymnastics, at the request and with the help of three families, the Yabuts, Yepezs, and Meltons. B.R.'s family

joined the efforts by contributing money. On December 8, 2000, B.R. and the other "six pack" members, Mia Yabut, Lilly and Andy Yapez, Jordan Melton, and Catherine Traxler began training at Esprit Gymnastics under the defendant's tutelage.

The defendant described B.R. and his relationship with her. He testified that B.R. had "ability in gymnastics." In addition, he stated that she was fearful, and this fear hindered her gymnastic development. The defendant said that B.R. was not "tough" and that none of the girls were, and as a coach, he had to "maximize [the girls'] strengths; . . . minimize their weaknesses." Thus, he described his coaching style as "aggressive." The defendant admitted that he developed more of a friendship with B.R. than the other girls because he "was over at [her] house more." He stated that this friendship interfered with his coaching and may have caused other students to quit practicing at his gymnasium.

Four defense witnesses, Dr. Yabut, Miss Yabut, Ms. Melton, and Ms. Day, described the defendant's and B.R.'s relationship. Doctor Yabut testified that B.R. "grabbed [the defendant's] attention all of the time." He stated that the relationship did not concern him until his daughter complained of a lack of attention from the defendant. Doctor Yabut also testified that he thought the female students had "crush[es]" on the defendant and that his daughter was jealous of B.R. Miss Yabut confirmed her father's opinion and admitted that she was "a little jealous of [B.R.'s] attention." She testified that the defendant would talk to B.R. more than he would the other students. Another defense witness at trial, Ms. Day, described the relationship, and she testified that she thought B.R. "had a little bit of a crush on [the defendant]." She testified that B.R. would walk up to the defendant and put her arms around his shoulders, or she would sit down with him and engage in conversation. Ms. Day testified that the defendant would ignore B.R., undrape her arm, and direct her to go perform a skill. Ms. Melton testified that B.R. "had a crush on [the defendant]." She testified that B.R. adored the defendant, and "[i]t was obnoxious" and "a huge annoyance."

The defendant testified to the size and layout of the gymnasium and office area. He stated that from the parent viewing area, all areas of the gymnasium were visible except the bathrooms and a portion of the rod floor where the hot water heater sits. He also explained that the office door would not close or lock, and he described the opening in the office wall, testifying that the opening was "90 inches tall or so, 65 inches wide." The defendant stated that he was never in his office alone with the door closed with B.R. or with any other student. Rob Tallman testified that in late August or early September the defendant closed the opening and asked him to finish the drywall.

The defendant denied touching B.R.'s vagina while she performed the frog stretch. He explained that the purpose of the stretch is to gain strength and flexibility, mainly for balance beam skills. He elucidated that frog stretches affect "hip turnout" and pelvic tilt. When students perform the frog stretch, coaches forcefully push downward on the buttocks to increase the stretch. The defendant stated that during the stretch, the student's hips rotate and the private area is underneath him or her "flat on the ground." He explained that "there is really nowhere for [a coach's

fingers] to go." Thus, he asserted that he never knowingly or accidentally touched B.R.'s vagina during the frog stretch.

Ms. Melton, Ms. Day, and Miss Yabut testified regarding stretching. Ms. Melton testified that a mat was "not necessarily" in the vicinity of the stretching. Both Ms. Melton and Ms. Day testified that neither one became alarmed when watching the defendant stretch B.R. Miss Yabut testified that she and other students practiced on the trampoline while the defendant stretched B.R. on the rod floor. She testified that she would watch the defendant stretch B.R. because she was jealous of the attention the defendant showed B.R. Miss Yabut also stated that she never saw the defendant inappropriately touch B.R. during the stretches.

The defense called B.R. to clarify where she was located on the rod floor when the defendant touched and filmed her vagina as she performed the straddle stretch. B.R. used a diagram she had drawn in a previous interview and identified the front of the gymnasium on the diagram. According to the diagram, her feet pointed toward the right wall.

On cross-examination, the State asked further questions regarding her location, and B.R. testified that she drew the diagram "from . . . if you look down." She further testified that her back was to the wall with mirrors. We discern from the record that the mirrored wall is the left wall of the gymnasium.

The defendant explained that B.R. had a fear of doing certain skills on the beam, namely the back walk over and the back handspring. On July 1, 2002, B.R. was scared to perform the back handspring, so the defendant explained that as part of his coaching strategy, he left the gymnasium. He stated that if he "remove[d himself] from the environment," then B.R. would want to perform the skill. He left a 17-year-old coach in charge of the students while he shopped at Home Depot. At this point, he telephoned B.R.'s mother and reported the incident. Upon returning to the gymnasium, he learned that B.R. had performed the skill, and at his request, she demonstrated it twice more.

Although Ms. Melton did not witness this incident, she testified to its occurrence.[15] She then testified that "B.R. was crushed because [the defendant] basically chose gymnastics over what she thought their relationship was." She explained that from that day forward, B.R. did not look at or speak to the defendant. She testified that B.R. made excuses for why she could no longer participate in gymnastics, and Ms. Melton testified that B.R.'s back injury, in her opinion, was not legitimate.

---

[15]Ms. Melton testified to the incident on direct examination. On cross-examination, the State elicited that she had not personally witnessed the event. The State moved to strike her prior testimony. While the trial court and counsel discussed the motion, Ms. Melton interrupted them four times, and the court had to instruct her to stop testifying. The trial court then denied the State's motion.

-13-

The defendant testified that B.R.'s mother telephoned him on July 2, 2002, and informed him that B.R. would not be attending practice. On July 3, the defendant and Mia Yabut arrived at B.R.'s home in the tumble bus. The defendant stated that Miss Yabut and B.R. played in the tumble bus while he showed B.R.'s mother the tumble bus's new generator, which B.R.'s mother had purchased. After B.R.'s mother returned inside the home, the defendant, Miss Yabut, and B.R. remained on the bus until Miss Yabut announced that she was going inside. Miss Yabut testified at trial that she left the bus "[b]ecause [she] thought they wanted to talk alone for a while." The defendant and B.R. then talked about her quitting gymnastics. The defendant testified that he encouraged her to keep participating. He stated that the conversation "centered around" "another skill on bars that she was particularly fearful of." He testified that B.R. never told him that she wanted to quit because he was sexually abusing her.

After Miss Yabut returned to the bus, the three went inside B.R.'s house. In B.R.'s bedroom, the defendant, B.R., and her mother discussed her future in gymnastics. The defendant stated that he, B.R.'s mother, and B.R. all cried during the conversation, and he did not testify whether B.R. made a decision to quit that night. The defendant, B.R., and her parents continued to discuss her gymnastics future throughout July, August, and September.

Defense witness Corporal Westbrook's testimony regarded her September 9, 2002 interview with B.R. Corporal Westbrook was the first Brentwood Police Department employee to interview B.R. after her parents contacted the police. Corporal Westbrook explained that she was the initial responding officer, and she did not question B.R. "per se." Eight days after the interview and at the request of Detective Breedlove, Corporal Westbrook wrote a supplemental report of this interview. She testified that B.R. told her that the defendant touched her breasts and vagina. She further testified that her report stated that "[B.R.] advised that [the defendant] had touched her breasts several times, too."

On cross-examination, Corporal Westbrook testified that the interview's purpose was to determine whether to investigate the allegations further. She stated that she wrote the report from cursory notes, and B.R.'s description of the breast touching "was just more fleeting than anything."

The defense called B.R. to testify regarding this issue, and B.R. stated that she told Corporal Westbrook that the defendant touched her breast "once for sure." She further testified, "I think I said several for him touching my vagina. I never said - I don't think I said several for him touching my breasts."

Two days after the September 9, 2002 interview, B.R. telephoned the defendant at the gymnasium. The defendant stated that he was teaching class at the time of the telephone call. He explained that during the conversation, he was preoccupied with his students. When B.R. told him that she was worried about him "[t]ouching [her] in [her] private spots," the defendant replied, "No, I'm not going to do that." He further testified that he "had never done that." The defendant explained that he was "shocked" by the comment and uncertain how to react. At trial, he denied filming and touching B.R.'s vagina, and he stated that he ended the telephone conversation with

-14-

"[w]hatever" because he refused to continue this conversation over the telephone. The defendant then spoke with B.R.'s mother. He explained at trial that he failed to discuss B.R.'s allegations with her mother because it was inappropriate to do so over the telephone.

On cross-examination, the State played the audiotape of the telephone call for the jury. The defendant agreed that on direct examination he testified that he "was shocked and caught off guard" by B.R.'s allegations during the telephone call. After hearing the audiotape, the defendant testified that "[s]hock and caught off guard may not be distinguishable in [a person's] voice."

Shortly after B.R. placed the September 11, 2002 telephone call, the police entered the gymnasium and spoke with the defendant in his office. After another coach finished the students' workouts and they left, the police searched the gymnasium. Afterwards, the defendant followed the police officers to his apartment where they continued searching. Because of the searches, the defendant explained that he never had the opportunity to discuss the allegations with B.R. and her mother. He agreed that the police seized several videotapes filmed by him.

At trial on cross-examination, Ms. Melton viewed, we surmise from the record, videotape A. She agreed that the videotape showed her daughter's crotch area while she was not performing a gymnastic skill, and Ms. Melton testified that the defendant "is really interested in anatomy." She testified that the defendant's purpose was to analyze "hip placement." Ms. Melton further testified that during the investigation, Detective Breedlove showed her a videotape with a close-up shot of her daughter's crotch,[16] and "maybe [she] did" tell Detective Breedlove that portions of the videotape were inappropriate. However, she testified that the videotape she viewed at trial did not "bother [her] whatsoever."

She viewed another scene on videotape A that showed a close-up of B.R.'s vaginal area and buttocks while she pushed a mat under another student performing a trick on the trampoline. Ms. Melton testified that the defendant would not film his students other than for gymnastics purposes. In response to Ms. Melton's answer, the State showed Ms. Melton two other scenes on the videotape outside of the jury's presence. Once the jury returned, Ms. Melton described what she saw. She testified that the scene showed the gymnasium's bathroom, and it showed that the defendant walked to the toilet, pulled down his shorts, sat on the toilet, and then wiped himself from the front. In the next scene, Ms. Melton agreed that the video camera was wrapped in a black material, and there was a hole in the material for the lens. She stated that "someone" came into the camera's view. When the State asked her if she noticed that the person's clothing changed to a "nude shade," she replied, "I'm not putting it together. I'm really not." She admitted that the person sat down on the toilet as the defendant did in the previous scene, but she stated that she was not sure whether the person reached for toilet paper. After testifying to the contents of these scenes, she still contended that the defendant "wouldn't tape the girls for any other purpose other than gymnastics."

---

[16]The record is unclear whether the videotape she viewed with Detective Breedlove was videotape A.

At trial, the defendant also reviewed portions of the videotapes. First, the defendant explained that the shots were of B.R.'s "pelvic area," not vaginal area. He commented that the focusing on B.R.'s pelvic area while she pushed a mat under another gymnast served gymnastic purposes, including the study of biomechanics, teaching tools for students, and teaching tools for coaches. He disagreed with Ms. Fox's testimony that the videotapes serve no gymnastic purpose and explained that he is a "minority in the coaching community" because of his "cutting edge" techniques. The defendant stated that the purpose of the close-up, pelvic shots of B.R. while she stood at the wall was to teach her the "Staulder press." He further explained that B.R. cannot perform a "Salto up," so he instructed her to perform "Salto downs." By focusing the camera on her pelvic area when she performs certain skills, he could analyze whether B.R.'s body position was biomechanically correct, namely her pelvic tilt.

At the end of his direct examination testimony, the defendant denied touching and filming B.R.'s vagina for sexual gratification purposes. He further denied touching her breasts for sexual gratification.

Regarding the bathroom scenes in videotape A, the defendant testified on cross-examination that he filmed the first scene on July 21, 2001, at 10:43 p.m. He admitted that the camera sat on a "drawer thing" in the bathroom of the gymnasium. He agreed that he paced in the camera's view, and then he walked to the toilet, pulled down his shorts, sat on the toilet, and then wiped himself from the front. The defendant further agreed that he filmed the second bathroom scene a few hours later at 4:26 a.m. He admitted that he surrounded the camera with black trash bags, the roll of extra trash bags being visible in the scene, and there was a hole for the lens. The defendant did not admit that he took his clothes off when the State asked him if he became "totally skin colored," but he agreed that he sat on the toilet and wiped himself from the front. After this portion of testimony, the State showed the videotape to the jury. The defendant contended that he did not attempt to covertly videotape students in the bathroom; he testified that he videotaped himself.

In rebuttal, the State called Andy Yepez, a former member of the "six pack," and she testified that the defendant stretched B.R. differently from the other students. The defendant placed his hands on B.R.'s buttocks instead of "on the side" of the back, as he did with every other student. Miss Yepez testified that when he stretched B.R., her view was frequently obstructed by a mat, and parents usually were not present. She admitted that the defendant stretched all students behind the mat and on the same place on the rod floor, but he stretched B.R. longer than he did the other students. The defendant stretched her for 30 seconds to one minute, but he stretched B.R. for approximately 10 minutes.

The State also called Nancy Westman, mother of one of defendant's former students. Ms. Westman described the defendant's and B.R.'s relationship. She testified that the defendant "favored" B.R.; "[h]e spent more time with her, and he hugged [B.R.] more than the other students." Ms. Westman stated that "[t]hey gave each other back rubs," and the defendant did not do this with other students. She testified to one occasion when the defendant and B.R. were tickling each other.

Ms. Westman described the interaction as "a boyfriend/girlfriend type relationship, like 16 year olds would act when [they're] dating."

Ms. Westman also described an interaction between B.R. and the defendant while they, along with other gymnasts and their family members, were on a 15-passenger van in San Diego, California. Ms. Westman testified that she and Ms. Melton sat behind B.R.'s mother and in front of B.R. and the defendant. She heard B.R. "kind of squirming," and B.R. said, "[N]o, [the defendant's name], no, just on my face." Ms. Westman turned around and observed the defendant tickling B.R.'s face. He then rubbed down her arm, eventually onto her leg and thigh. Ms. Westman testified that she heard B.R. state to just touch her face several times. She stated that she "felt uncomfortable," so she "nudged" Ms. Melton, who looked at them and then, according to Ms. Westman, shook and put her head down. When Ms. Westman heard B.R. say it again, she "turned around completely in [her] seat." She testified that she looked at him and "gave him a look, like what are you doing." Ms. Westman testified that she did not mention the incident to him on the van because she did not want "to get into a big scene."

In surrebuttal, the defendant called Ms. Melton, and she testified regarding the San Diego incident. Ms. Melton testified that the defendant touched B.R.'s face and arms in a "playful" manner; she described the interaction between the two as "child's play." She stated that B.R. would tell the defendant to stop and that B.R. "was being silly." Ms. Melton testified that there was nothing "sexual" about the actions.

At the close of all proof, the State elected certain offenses. We summarize the election as follows:

| Count | Charge | Location/Time |
|---|---|---|
| 1 | Aggravated sexual battery | First time defendant touched B.R.'s vaginal area over her leotard during frog stretches on the rod floor |
| 2 | Aggravated sexual battery | First time defendant touched B.R.'s vaginal area under her leotard during frog stretches on the rod floor |
| 3 | Aggravated sexual battery | Time when defendant touched B.R.'s vaginal area under her leotard while in a straddle stretch on the rod floor and defendant and B.R. negotiated the length of the touching |
| 4 | Aggravated sexual battery | May 2002 when the defendant touched B.R.'s breast with his hand while in the gymnasium's office |

-17-

| | | |
|---|---|---|
| 5 | Aggravated sexual battery | Time when defendant made B.R. touch his penis with her hand while in the gymnasium's office |
| 6 | Aggravated sexual battery | Time when defendant made B.R. touch his penis with her hand through his pocket while in the gymnasium's office |
| 7 | Aggravated sexual battery | Time when defendant touched B.R.'s vaginal area while he videotaped her vaginal area on the rod floor |
| 8 | Especially aggravated sexual exploitation of a minor | Time when defendant touched B.R.'s vaginal area while he videotaped her vaginal area on the rod floor.[17] |

The jury deliberated and found the defendant guilty of all State-elected offenses.

## I. DISCOVERY RELATED COMPLAINTS

The defendant's first appellate complaint is that unreasonable restrictions on defense access to discovery materials violated Criminal Procedure Rule 16 and his right to counsel guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. The defendant identifies the discovery materials as (1) approximately 25 videotapes seized from his home when officers executed a search warrant, (2) information extracted from his home computer, and (3) an audiotape of a telephone conversation between the defendant and the victim. Insisting that the materials were "pornographic," prosecution counsel refused to copy or duplicate them for the defendant and, instead, required the defense to appear personally at the police department to review the materials. The trial court sanctioned the State's restrictions on discovery and ruled that the evidence could be viewed only at the police department at a mutually convenient time and that the tapes would not be copied.

Tennessee Rule of Criminal Procedure 16(a)(1)(F) provides,

> Documents and Objects. – Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the state's possession, custody, or control and:

---

[17]Counts are numbered according to the State's Election, which was included in the jury instructions. They are not numbered according to the original indictment.

(i) the item is material to preparing the defense;

(ii) the government intends to use the item in its case-in-chief at trial; or

(iii) the item was obtained from or belongs to the defendant.

Tenn. R. Crim. P. 16(a)(1)(F).[18]

The language of Rule 16(a)(1)(F) is straightforward, and the State's duty is mandatory. Upon request, "the state *shall permit*" inspection and copying. *Id*. (emphasis added). In *State v. Richard Allen Butler*, No. E2004-00359-CCA-R9-CD, slip op. at 10-13 (Tenn. Crim. App., Knoxville, Mar. 30, 2005), *perm. app. denied* (Tenn. 2005), the court rejected the State's argument that copying and disseminating discovery materials containing alleged child pornography would violate Tennessee's exploitation of a minor statute.

Our review of the record leaves us at a loss to discern a valid basis for the discovery restrictions, which were prompted ostensibly by the State's claim that the materials were pornographic and would revictimize the victim. Nothing in the audiotape of the conversation between the defendant and the victim is remotely pornographic, and the State *asked* the victim to assist with the investigation by placing the telephone call. The materials extracted from the defendant's computer depict individuals other than the victim, and at the sentencing hearing Detective Breedlove insisted that he was not representing to the court that the images contained unlawful pornography. Regarding the videotapes, the trial court articulated its ruling in the following fashion:

> [T]he Court has before it the motion of defendant to compel the State to produce copies of videotapes.
>
> The case in this state is that the prosecution is not required to reveal its entire file in a particular case, but is required to disclose evidence favorable to the defendant that if suppressed would deprive the accused of a fair trial.
>
> . . . .

---

[18] Effective July 1, 2006, the Tennessee Rules of Criminal Procedure were "reformatted." As part of that undertaking, numerous sections and/or subparts of various rules were renumbered. Previously, the section of Rule 16 that addressed discovery of documents and objects was (a)(1)(C). Discovery of tangible objects now appears in section (a)(1)(F). *See* Compiler's Notes, Tenn. R. Crim. P. (effective July 1, 2006).

The Court is of the opinion that the law in this state is – is that that which must be disclosed is that to ensure a fair trial, the procedure proffered by the State, in this Court's judgment, affords the defendant a fair trial and this is how the Court would like the order to read: That the defendant may inspect the video – the 12 videotapes at issue at the police department, at a mutually convenient time, in a room, provided a private room, at which time defense counsel may view the tapes, but the Court is not allowing the tapes to be copied and disseminated at this time.

. . . [D]efense counsel shall not disclose the contents pending further orders of the court. Any expert . . . [and] any parent of any student that defense counsel may bring to the viewing is also under the same Protective Order.

The trial court misapprehended the requirements of Rule 16. Its reference to the State's obligation to disclose evidence favorable to the defendant that, if suppressed, would deprive the accused of a fair trial is a classic statement of the prosecution's *constitutional* duty to disclose exculpatory evidence. *See Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). In addition to that obligation, however, Rule 16(a)(1)(F) requires the State to permit inspection and copying of certain tangible items without regard to the exculpatory nature of the discovery materials. Evidently, the trial court regarded its authority as restrained only by the amorphous "fair trial" regimen, thereby failing to recognize that Rule 16, itself, strikes a considered balance and is quite specific in delineating the State's mandatory obligations to produce certain discovery materials.[19]

We note that on appeal the State makes no effort to defend the discovery restrictions and argues, instead, that no reversible error has been demonstrated. On that point, we agree. Although the "potential" for prejudice from such restrictions is readily evident, reversible error requires more palpable harm.

For example, the defendant argues that his attorney "wasted hours of his time traveling back and forth to view tapes he could have reviewed at his convenience in his office" and that defense counsel "never did get to see all of the tapes because of the restrictions imposed by the Court." A party who fails to take reasonably available steps to mitigate the harmful effect of an error, however, is not entitled to use the error to obtain relief on appeal. *See* Tenn. R. App. P. 36(a). There is no evidence in the record that the defendant sought a trial continuance to afford additional time to complete his review of the videotapes. Similarly, wasted attorney time, without a

---

[19] The nondisclosure portion of the trial court's order regarding defense counsel, any defense expert, and any parent is not objectionable, *see State v. Richard Allen Butler*, No. E2004-00359-CCA-R9-CD, slip op. at 12-13 (Tenn. Crim. App., Knoxville, Mar. 30, 2005), *perm. app. denied* (Tenn. 2005)*,* and indeed defense counsel stated on the record that he acquiesced to those restrictions provided copies of the discovery materials were given to defense counsel.

demonstrable showing of prejudice to the client's defense, as opposed to the attorney's "bottom line," does not rise to the level of reversible error.

The defendant also maintains that he "wanted to have experts examine the tapes[,] but the financial situation was such that they could not afford to have experts travel to Brentwood to view these tapes." This bare assertion made during the hearing on the defense motion to compel access to discovery materials is inadequate in our opinion to demonstrate the requisite harmful prejudice. In the hearing on the motion for new trial, the trial court should not have rebuffed the defendant's proffer of testimony from trial counsel, but we fail to discern, at any rate, how trial counsel's testimony could or would have established reversible error predicated on specific expert testimony that was prohibitively expensive to obtain.

The failure to supply the defendant with a copy of the audio taped conversation between the victim and the defendant is, from this record, indefensible. At one point, prosecution counsel mentioned, somewhat in passing, that the police department did not have the equipment required to duplicate a microcassette tape recording, to which defense counsel retorted that the detective "can go to Radio Shack and buy a plug that you can plug between two tape recorders that cost you $2.95." At any rate, the customary need for a copy of the audio cassette recording is to permit a comparison with the transcript that the State intends to offer at trial. In that fashion, any transcription inaccuracies or disputes can be resolved pretrial. In the present case, the defense does not point to any such inaccuracies with the State's furnished transcript or other specific prejudice warranting relief on appeal.

In conclusion, we decline the defense's invitation to find per se reversible error. No doubt error in the discovery process occurred in this case, and the defendant's frustration with the discovery gauntlet is palpable from the record on appeal. However, we are not persuaded that the defense has established the requisite prejudice for entitlement to a new trial.

## II. PUBLIC TRIAL

The Sixth Amendment to the United States Constitution[20] and Article I, Section 9 of the Tennessee Constitution afford an accused the right to a "public trial." *See In re Oliver*, 333 U.S. 257, 68 S. Ct. 499 (1948); *State v. Sams*, 802 S.W.2d 635 (Tenn. Crim. App. 1990). This right is regarded as "a shared right of the accused and the public, the common concern being the assurance of fairness." *Press Enterprise Co. v. Superior Court*, 478 U.S. 1, 7, 106 S. Ct. 2735, 2739 (1986). "Transparency," it has been said, "is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused." *Smith v. Doe*, 538 U.S. 84, 99, 123 S. Ct. 1140, 1150 (2003). The right to a public trial is not absolute, however, and in certain

---

[20] An enlightening exposition of the legal pedigree undergirding the right to public trial appears in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S. Ct. 2814 (1980) (tracing the origins of the right from "back beyond reliable historical records" in the "days before the Norman Conquest" to the judicial systems of colonial America).

cases must yield to other rights or interests. *See Waller v. Georgia*, 467 U.S. 39, 45, 104 S. Ct. 2210, 2215 (1984).

The defendant in this case constructs an argument that his due process and public trial guarantees under the federal and state constitutions were abridged because the trial judge excluded the public from viewing the videotapes of gymnastics which showed the victim. The public was excluded, the defendant insists, because when the videotapes were identified and played, the trial judge forced the public spectators on numerous occasions to "shift" to another part of the courtroom to ensure that they could not see the evidence. The State, for its part, does not dispute that the trial judge screened the media and public from viewing videotapes of the victim by arranging the courtroom so that only the jury, witnesses, the defendant, and attorneys could see the videotapes. Instead, the State maintains that the defendant waived the issue by failing to object and, indeed, by being the instigator of the seating arrangement. The State also asserts that the trial judge's actions conformed to Tennessee Supreme Court Rule 30(C)(1) which forbids media coverage in any judicial proceeding "of a witness, party, or victim who is a minor." Tenn. Sup. Ct. R. 30(C)(1).

We begin by examining the context in which this issue arose. In a jury-out hearing during Detective Breedlove's testimony, the parties and the court discussed various aspects of how and what portions of the videotapes would be played for the jury. Defense counsel addressed the trial court as follows:

> MR. JOHNSON: Your Honor, please, one of the reasons that in an earlier hearing General White raised about providing copies to us was the potential revictimization of the victim if it got released outside. I know there [are] members of the public sitting out there, and they are obviously interested in the tapes. And what is – is it Your Honor's intention for them also to be allowed to see the tapes in light of the General's objection that she didn't want the victim to be revictimized by this? Or does the public have the right to see the video tapes? . . .

> GENERAL WHITE: The public has a right to be in the courtroom. There is no provision from barring them from being in the courtroom. I will defer to the court on the other issue whether or not Your Honor wants to make them sit down. But I know that in these type of cases there's always public in the courtroom and there is no provision in the law to bar them from a public courtroom.

> MR. JOHNSON: As I indicated earlier my only concern was that earlier the General had argued against us getting copies based on the potential for revictimizing the victim, by letting other people outside of the immediate parties see these video tapes.

THE COURT: All right. I guess I'll first start with the media. Who here is from the media? Stand up. All right, and ma'am you're the last person from the media that is here?

UNIDENTIFIED SPEAKER: They are out in the hallway.

THE COURT: In the hallway? You're with whom?

UNIDENTIFIED SPEAKER: With Channel 4.

THE COURT: You're with Channel 4. Probably, the other media folks ought to come in here because I am just going to ask y'all what y'all want and that will tell me what I need to decide. . . .

. . . .

THE COURT: I appreciate you bringing that up, Mr. Johnson, that was very nice. Okay. Is that everybody? We got Channel 4, we got FOX 17. . . . So 4 and 17. Now 2 and 5 are not here, they were here yesterday.

. . . .

THE COURT: Right, I was going to let y'all sit over there and you can hear and watch the jury, but Mr. Johnson has a good point, we don't want a, quote revictimization, or alleged revictimization of alleged victim at this time. This case is in progress and it is hard enough as it is. So but the rule – I'm giving deference to Supreme Court Rule 30, so I'm wondering if you have any problem with it, sitting over here and not watching this?

UNIDENTIFIED SPEAKER: I would just say if the public at large is allowed to watch, we should be allowed to watch too. . . . That would be my only argument.

THE COURT: I can make a decision about the public at large without asking. I think Mr. Johnson has a good point. I don't want to see this child or another child, we used the term revictimized and . . . I'm also by saying that that I am recognizing that the defendant is presumed innocent . . . . So by saying all that I'm ruling that I'm going to ask the public and media, you may stay in the courtroom during this process but I don't want you seeing this video tape. You can hear about it, but I don't want you watching it at this time. So

-23-

maybe if I can get you all over in that section. Thanks. So the camera and the audio pickup is off.

. . . .

THE COURT: Once we start we need to have a deputy posted at the door and stop them until a break. . . . So, why don't I get the court officers to go out there and see if there is anyone [who] wants to be in the courtroom now, they need to come in . . . . Mr. Johnson, if you want to weigh in on any of these instructions up to now, you may. Do have any objection to the way the Court has handled it up to now.

MR. JOHNSON: No, Your Honor.

The trial transcripts also reflect several additional times when the court directed members of the audience to move.

We are not persuaded initially that a complete or partial closure of the courtroom occurred in this case.

A complete closure has the effect of excluding everyone from the courtroom with the exception of the parties, the attorneys, court personnel, and the witnesses. A complete closure may be for the entire trial or proceeding, or a portion of the proceedings such as the testimony of a particular witness. A partial closure results in the exclusion of certain members of the public while other members of the public are permitted to remain in the courtroom.

*Sams*, 802 S.W.2d at 639. No members of the media or public were barred from the courtroom in this case, and the State noted specifically on the record that the public had a right to be in the courtroom. To be sure, the trial court arranged the courtroom to screen the media and public from viewing videotapes of the victim, but courtroom spectators often are disadvantaged in viewing trial exhibits as they are offered and introduced. Furthermore, the record discloses that the only media objection was couched in terms of equal treatment for the media and the public. *See Wilbert Rogers v. State*, No. W2004-00654-CCA-R3-PC, slip op. at 3-4 (Tenn. Crim. App., Jackson, Feb. 22, 2005) (declining to find closure of judicial proceedings because trial judge had his court open, even though other courts were apparently closed due to weather; weather-related closing of other court-rooms did not result in denial of a public trial).

The defense cites to no authority describing what happened in this case as a complete or partial closure of trial proceedings. However, even if the right to a public trial was somehow implicated, we believe the issue is resolved by the defendant's failures to object to the trial court's

actions or otherwise make known his concern. Therefore, we conclude that the defendant waived his right to a public trial to the extent that what occurred can even be characterized as a "closure." *State v. Tizard*, 897 S.W.2d 732 (Tenn. Crim. App. 1994) (finding waiver when defendant failed to object to trial court's exclusion of journalism students during the cross-examination of the victim involving vulgar references to masturbation).

The defendant insists that he did not waive any rights and that the State has taken "completely out of context" his negative response to the trial court's inquiry whether he objected "to the way the Court has handled it up to now." We disagree; from the transcript, it is altogether reasonable to conclude that a waiver occurred. At any rate, even if the trial court and defense counsel were discussing some other matter, such as instructions to the media, the record plainly discloses that the defense did *not* object when the seating arrangement was being discussed at an earlier point. Finally, even if the defense broached the subject tongue-in-cheek to highlight the inequity of the trial court's restrictions on defense discovery, the defense was not thereby relieved of the obligation of formally objecting to the seating arrangement orchestrated by the trial court.

In summary, the defendant is not entitled to a new trial regarding any claimed violation of his right to a public trial.

### III. JURY INSTRUCTION REGARDING DEFENDANT'S TESTIMONY

In his third issue, the defendant complains that the trial court improperly impeached him and struck his testimony, violating his Due Process rights and obstructing the jury's Sixth Amendment factfinding function. He predicates his complaint on the following portion of the State's cross-examination of him:

> Q. And this has been - you have been to the Brentwood Police Department several times with [defense counsel]; is that correct?
>
> A. I have been to the Brentwood Police Department with [defense counsel] on several occasions.
>
> Q. And you've looked at videotapes?
>
> A. I was unable to look at the videotapes in their entirety because of the strict rules that the Court put on us.

Later during the defendant's cross-examination, the court held a jury-out hearing on another issue, and after this hearing, but before the jury returned, the court sua sponte proposed a curative instruction regarding the defendant's comment that he "was unable to look at the videotapes in their entirety because of the strict rules that the Court put on [him]." The judge explained, "On appeal, an argument in the record like that, that the court of appeals may assume that's true because he wasn't corrected on the record." Defense counsel replied, "I have no problem with putting that

-25-

on the record, except for the fact that I don't want that to be construed as my agreeing to Your Honor's protective order." The trial judge then asked if the jury should be instructed to disregard the statement as being unresponsive, and defense counsel answered, "Yes." When the jury returned, the court instructed them "to disregard any comment that the defendant made in his testimony concerning any alleged denial of access to tapes by the Brentwood Police Department prior to today."

On appeal, the defendant claims that the trial court's instruction was error. We decline the defendant's request for relief on this basis because he created his own predicament both by failing to object at the appropriate time and by inviting the court to do the very thing of which he now complains. *See* Tenn. R. App. P. 36(a). This court is loath to place a trial court in error when the party complaining on appeal failed to take corrective action with respect to any error which allegedly occurred below, and we are particularly loath to do so where the complaining party affirmatively acquiesced in the trial court's action. *See id.* (nothing in rule requires "relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). This issue is waived.

## IV. TRIAL COURT'S QUESTIONING OF WITNESSES

The defendant claims that the trial judge was biased and improperly asked questions of State witnesses that bolstered their testimony and "constituted prohibited judicial comment." *See* Tenn. Const. art. VI, § 9. Responding to the State's contention that he waived the issue, the defendant asserts that the trial judge's questioning constituted plain error.

The Tennessee Constitution prohibits judges from making any comment "with respect to matters of fact." Tenn. Const. art. VI, § 9; *State v. Suttles*, 767 S.W.2d 403, 406 (Tenn. 1989). The aim of this rule is to avoid giving "the jury any impression as to [the judge's] feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *Suttles*, 767 S.W.2d at 407; *see State v. Brown*, 823 S.W.2d 576 (Tenn. Crim. App. 1991). "It is natural that jurors should be anxious to know the mind of the Court, and follow it; therefore, a Court cannot be too cautious in [its] inquiries." *McDonald v. State*, 89 Tenn. 161, 164, 14 S.W. 487, 488 (Tenn. 1890).

That said, our Tennessee Rules of Evidence specifically permit the interrogation of witnesses by the trial judge:

> (b) Interrogation by Court. The Court may interrogate witnesses.
>
> (c) Objections. Objections . . . to interrogation by [the court] may be made at the time or at the next available opportunity when the jury is not present.

Tenn. R. Evid. 614(b), (c). So long as the inquiry is impartial, trial courts may ask questions to either clarify a point or to supply any omission. *See Collins v. State*, 220 Tenn. 275, 416 S.W.2d 766

(Tenn. 1967); *Parker v. State*, 132 Tenn. 327, 178 S.W. 438 (Tenn. 1915). Also, our rules entrust to the trial court the power to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel." Tenn. R. Evid. 611(a).

Furthermore, Tennessee Rule of Appellate Procedure 36(a) states that appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Sims*, 45 S.W.3d 1, 16 (Tenn. 2001). The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal.

Before discussing the specific testimony at issue, we note, as the State points out, that the defendant failed to object, move for a mistrial, or otherwise complain before the trial court began its examination of the witnesses, during the course of its examinations, or during "the next available opportunity when the jury [was] not present."[21] Tenn. R. Evid. 614(c); *see* Tenn. R. App. P. 36(a); Tenn. R. Evid. 103(a)(1); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987). Therefore, this issue, with regard to each of the four examinations, has been waived. Failing to object constitutes a procedural default for which relief may not be obtained absent the existence of plain error. *See Teague v. State*, 772 S.W.2d 915, 926 (Tenn. Crim. App. 1988); *State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988).

## A.  Appellate Review of Plain Error

Before an error is recognized as plain error, it must be "plain" and must affect a "substantial right" of the accused. The term "plain" equates to "clear" or "obvious." *See United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777 (1993). Plain error is not error that is simply conspicuous; rather, it is especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. *See State v. Wooden*, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983).

---

[21]After defense counsel's redirect examination of B.R. but prior to the trial judge's questioning of B.R., the trial judge asked for a bench conference. The record fails to reflect what transpired, and immediately after the bench conference, the trial judge asked B.R the questions that are the subject of this issue.

Neither during nor after the trial judge's examination of B.R. did defense counsel object. It is unclear from the record whether defense counsel objected during the inaudible bench conference. It is well settled that when a party seeks appellate review, there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal. *See State v. Ballard*, 855 S.W.2d 557, 561 (Tenn. 1993) (holding failure to include transcript precludes appellate review); *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) (holding trial court's ruling presumed correct in the absence of an adequate record on appeal). When the record is incomplete and does not contain the relevant information documenting an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue. *See State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). Absent the necessary relevant material in the record, we cannot find that defense counsel objected to the trial court's questioning of B.R.

In *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this court defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense and . . . constitutional in nature." *Id.* at 639. In that case, this court established five factors to be applied in determining whether an error is plain:

> (a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused [must not have waived] the issue for tactical reasons; and
>
> (e) consideration of the error must be "necessary to do substantial justice."

*Id.* at 641-42 (footnotes omitted). Our supreme court characterized the *Adkisson* test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error. *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000).

## B. Questioning of the Victim

Although B.R. testified during the State's case-in-chief, the defendant recalled B.R. to the stand in his defense. During her testimony, the trial judge held a bench conference, but the record fails to reflect what transpired. Afterwards, the trial judge advised B.R. that the court was going to ask questions, and the trial judge reminded her that she was under oath. The following exchange then ensued:

> Q. [B.R.], what you have called inappropriate that [the defendant] has done to you, have you made any of these things up?
>
> A. No.
>
> Q. Has anyone told you what to say against him?
>
> A. No.
>
> Q. Or has anyone coached you to say things against him about the inappropriate things?
>
> A. No.
>
> Q. Anybody coached you to say that things were inappropriate that he did to you?

A. I don't understand the question very well.

Q. Okay. By the word "coached," I meant basically told you what to say or how to say it against him.

A. No.

Q. Thank you. Now, you all have follow-up on any of these three or four questions, if you'd like.

The State then asked a few follow-up questions regarding whether she was told to tell the truth and whether she was telling the truth. B.R. answered affirmatively. The State previously had asked a similar question on its direct examination of B.R. In that instance, the State asked, "[B.R.], would you make this up just so you could get out of going to gymnastics?" B.R. replied, "No, I could never make up something like this."

In applying the *Adkisson* plain error factors in this case, our analysis ends after factor one, "the record must clearly establish what occurred in the trial court." 899 S.W.2d at 641. In the present case, the record is silent as to what transpired during the bench conference held immediately prior to the trial judge questioning B.R. This court may not speculate as to what was discussed, whether defense counsel objected to such questioning, whether defense counsel failed to object for tactical reasons, *see Adkisson*, 899 S.W.2d at 641-42 ("[T]he accused [must not have waived] the issue for tactical reasons"), whether defense counsel requested such questioning, or whether the bench conference regarded another issue. Therefore, because the first factor in *Adkisson* is not satisfied, we do not find plain error.

## C. Questioning of State's Gymnastics Expert

The trial judge also questioned the State's gymnastics expert, Ms. Fox. The trial judge inquired, "In your opinion, ma'am, should a gym instructor obtain parental consent before videotaping a participant." Ms. Fox replied, "Not if it's a legitimate video for training purposes." The defendant claims that this question was biased and improper. The trial judge asked this "one follow-up question" after several questions from the jury.

We decline to find plain error because "a clear and unequivocal rule of law" has not been breached and because the defendant's substantial rights have not been adversely affected. *Adkisson*, 899 S.W.2d at 641. The defendant claims that this question amounted to a judicial comment, violating Tennessee Constitution Article 6, section 9. *See* Tenn. Const. art. VI, § 9. In our view, the question did not amount to a comment on the evidence. The record does not contain any indication of the trial court's opinion of the evidence, and the jury was properly informed that it had complete fact-finding authority.

## D. Questioning of Victim's Mother

The defendant also claims that the trial judge improperly asked B.R.'s mother a question that bolstered B.R.'s testimony. After re-cross examination, the trial court allowed the jury to submit in writing proposed questions to the witness. The prosecution and defense counsel silently read each submitted question. The trial judge inquired outside the hearing of the jury whether there were any objections, and both parties replied, "No, Your Honor." Thus, the trial judge read each question to B.R.'s mother, and she answered each one in turn. The defendant now claims that the last question was improper. The trial judge asked, "Do you know if [B.R.] shared her story about [the defendant] with any of her friends at any time?" B.R.'s mother answered, "Yes, she has."

Again, the trial court has discretion to interrogate witnesses, Tenn. R. Evid. 614(b), and in the present case, the trial court examined B.R.'s mother by asking jury-submitted questions.[22]

---

[22]Regarding such questions, Tennessee Rule of Criminal Procedure 24.1(c) provides:

> Juror Questions of Witnesses. – In the court's discretion, the court may permit a juror to ask a question of a witness. The following procedures apply:
>
> (1) Written Submission of Questions. – The juror shall put the questions in writing and submit it to the judge through a court officer at the end of a witness's testimony. A juror's question shall be anonymous and the juror's name shall not be included in the question.
>
> (2) Procedure After Submission. – The judge shall review all such questions and, outside the hearing of the jury, shall consult the parties about whether the question should be asked. The judge may ask the juror's question in whole or part and may change the wording of the question before asking it. The judge may permit counsel to ask the question in its original or amended form in whole or part.
>
> (3) Jury Instructions. – When juror questions are permitted, the court shall instruct jurors early in the trial about the mechanics of asking a question and to give no meaning to the fact that the judge chose not to ask a questions or altered the wording of a question submitted by a juror.
>
> (4) Retaining Questions for Record. – All jurors' questions – whether approved or disapproved by the court – shall be retained for the record.
>
> Tenn. R. Crim. P. 24.1(c).

This rule became effective July 1, 2006, as part of a comprehensive "reformatting" of all of the Criminal Procedure Rules. *See* Compiler's Notes. An earlier version of Rule 24.1 provided:

> Juror Questions of Witnesses. – In the court's discretion, a juror desiring to propound a question to a witness may be permitted to do so. The juror must put the question in written form and submit it to the judge through a court officer at the end of a witness's testimony. The judge shall review all such questions and, outside the hearing of the jury, shall consult the parties about whether the question should be

(continued...)

*See State v. Robert Bacon*, No. 03C01-9608-CR-00308, slip op. at 32 (Tenn. Crim. App., Knoxville, Jan. 8, 1998) (concluding that the trial judge, in asking two questions submitted by the jury, did not comment on the evidence such that it violated the defendant's rights).

We see nothing in the judge's questioning which would leave an improper impression with the jury as to his feelings about the evidence, and the judge made no statements which would reflect upon the weight or credibility of the evidence, including B.R.'s testimony; thus, we find that this contention provides no basis for a reversal because the question did not amount to a judicial comment and did not adversely affect the defendant's rights.

### E. Questioning of State's Social Worker

Last, the defendant claims that the trial judge asked improper questions of State witness Ms. Thompson, the licensed clinical social worker with Our Kids Center. After cross-examination and before questions from the jury, the trial judge asked Ms. Thompson several questions, as follows:

Q. Ma'am, you used the word "pain" in one of your answers.

A. Yes.

Q. How many times was there a report by the child of experiencing "pain," using that word.

A. I did not ask her quantitative.

Q. How many times in your notes or your recollection was that word used in the context of the touching?

A. Of the medical? Basically, I just said was there any - did you experience any pain or have any bleeding?

Q. An the answer was?

_____

[22](...continued)
propounded. The judge, in his or her discretion, may ask the juror's question in whole or part and may change the wording of the juror's question before propounding it to the witness . . . .

Tenn. R. Crim. P. 24.1(c).

The earlier version took effect on July 1, 2003, and governed the defendant's trial which commenced July 7, 2003.

A.  She said that there was no bleeding, and she felt pain when he touched her private spot.

We again decline to find plain error.  In answering a question on direct examination, Ms. Thompson testified that B.R. told her she experienced pain when the defendant touched her "private spot."  Neither the State nor the defendant questioned Ms. Thompson further about this statement.  The trial court's question was cumulative and did not adversely affect the defendant's rights.

## V.  VICTIM'S MEDICAL REPORT

Relying on his rights to present a defense and to a fair trial, the defendant complains that the trial court erroneously refused to allow his defense expert to testify regarding the findings of a medical examination indicating that the victim had no physical injuries.  The State claims that the evidence was irrelevant and that the examination could neither confirm nor exclude any sexual contact between the defendant and the victim.

As quoted in the preceding issue, the record reflects that when Ms. Thompson, a licensed clinical social worker, interviewed the victim, the victim reported that she experienced some "pain" when the defendant touched her but no bleeding.  The trial court became involved in questioning the witness and asked how many times the victim had reported experiencing pain and how many times the word "pain" appeared in the witness's notes.  Ms. Thompson responded that she did not ask the victim how many times pain was involved; rather, the victim told her that she felt pain when the defendant touched her  "private spot."

At the conclusion of the State's case-in-chief, the defendant proffered the testimony of Dr. Edmond Yabut, a board certified emergency physician.  Doctor Yabut was offered as an expert in pediatrics, and the defense wanted Dr. Yabut to testify that the victim's references to pain when the defendant touched her would be consistent only with an injury to the hymen and that a physical examination of the victim had revealed no such injury.  The testimony, the defense insisted, was relevant to the veracity of the victim.

The State cross-examined Dr. Yabut on the proffer.  Doctor Yabut was unaware that the victim told Detective Breedlove that she experienced no pain.  Doctor Yabut testified that pain is a "very objective finding."  He opined that if the defendant had just touched the victim's "majora and the minora," no injury would be expected.

The trial court questioned the parties whether "pain" was a disputed factual issue.  The State insisted that whether the victim experienced pain was a collateral matter for which extrinsic proof should not be admitted.  The defense admitted that causing pain is not an element of aggravated sexual battery or exploitation of a minor.  The trial court then excluded Dr. Yabut's testimony finding that it would not substantially assist the trier of fact to determine a fact in issue.

On appeal, the State attaches significance to the medical report of the victim's examination having not been admitted or authenticated. The State argues that because the defendant did not seek to introduce the report into evidence, the defendant was prohibited from eliciting Dr. Yabut's testimony regarding the report. We disagree.

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Tenn. R. Evid. 703. At any rate, the trial court's exclusion of Dr. Yabut's testimony was not based on the admissibility of the medical report; the trial court did not regard the victim's pain or lack thereof to be a fact in issue and did not regard Dr. Yabut's testimony as substantially assisting the trier of fact to determine a fact in issue.

All evidence, including expert testimony, must be relevant. Tenn. R. Evid. 402. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id*. 401. Relevant evidence may be excluded if its probative value is "substantially outweighed" by the danger of unfair prejudice. *Id*. 403.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *McDaniel v. CSX Transp., Inc*., 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Its counterpart, Rule 703, focuses on the reliability of expert opinion testimony. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993).

The defendant argues that Dr. Yabut's expert testimony rebutted the State's case and impeached the credibility of Ms. Thompson and lay witnesses, including the victim. From our review of the record, Dr. Yabut's testimony would not have significantly impeached the victim's credibility inasmuch as the victim did not testify about any touching involving pain. Ms. Thompson's credibility would not have been impeached; her testimony simply related what the victim had said. Other trial testimony had shown that the victim made inconsistent statements at different times.

It is troubling that the State elicited from Ms. Thompson the victim's report of experiencing some pain, that the trial court then questioned Ms. Thompson about the same matter,

and that the State later argued that whether the victim experienced pain was a collateral matter. It strikes us that the State and the trial court share responsibility for opening this line of questioning and that the defense was thereby entitled to explore the same area. To be sure, Dr. Yabut's testimony appears marginally relevant, but that assessment goes to the weight, not the admissibility, of his testimony. Even so, we are convinced that any error in disallowing Dr. Yabut's testimony is harmless. By its own terms, the medical report, which is present in the record, indicated that the victim's examination neither confirmed or ruled out the possibility of any type of sexual contact. For these reasons, the defendant is not entitled to a new trial on this claim.

## VI. COMPULSORY JOINDER AND DOUBLE JEOPARDY

In an issue raised in a Tennessee Rule of Appellate Procedure 10 interlocutory appeal, joined on appeal with the defendant's Rule 3 issues, the defendant complains that the trial court should not have severed the three child rape counts, over his objection, on the morning that trial began. He insists that the trial court procedurally erred in considering the motion and that the State's motivation for seeking severance was to gain an improper tactical advantage.[23] As a result, he argues and that a future trial on the severed rape charges is barred by the compulsory joinder provisions of the Tennessee Rules of Criminal Procedure and by state and federal constitutional double-jeopardy guarantees. The State counters that the trial court properly severed the rape charges because they were not part of the same criminal episode as the other charges and because severance was necessary to promote a fair determination of the defendant's guilt or innocence of each offense.

### A. Consolidation and Severance of Offenses

We can quickly dispose of the defendant's procedural objection to the timing of the State's motion. From the record before us, it does not appear that the defendant objected to the motion as untimely. That argument is, therefore, waived. *See* Tenn. R. Crim. P. 14(b)(2)(A); Tenn. R. App. P. 36(a).

Turning next to the substance of the State's motion, the written motion to sever states, in its entirety, the following:

> Comes now the State of Tennessee, by and through the office of the District Attorney General, pursuant to Tenn. R. Crim. P. 13, and *State v. Leath*, No. 01C01-9511-CC-00392 (Tenn. Crim. App. 1998) (attached), and moves this Honorable Court to sever the rape counts from all other offenses in the related case.

---

[23] Although the defendant impugns the State's motive in seeking to sever the child rape counts on the basis of gaining an unfair tactical advantage in the trial of the aggravated sexual battery charges, we do not discern from the defendant's presentation and analysis of this issue on appeal that he is asserting reversible error in connection with his aggravated sexual battery convictions. We, accordingly, confine our review to the question whether a future trial on the severed rape charges is barred.

This motion, to say the least, is uninformative, and the transcript of the severance hearing provides marginal enlightenment. We discern that the State supported its severance request on the basis that the videotapes depicting the victim would be relevant to the aggravated sexual battery counts but less probative of the child rape counts. The defendant argued against severance based on judicial economy and the victim's expected testimony intertwining both types of offenses. The trial court ruled,

> Now in this case, the Court finds that the motion to sever[] is well taken and shall be sustained. Noted defendant's objection. The Court finds that it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence in each offense pursuant to Rule 14(b)(2)(A) (inaudible) discretion in that regard. So those three counts will be severed.

We begin by noting that each count in the charging instrument in this case alleges a time frame of "May 2001 through June 2002, inclusive." The State-supplied bill of particulars described the child rape offenses in Counts One, Three, and Five of the original charging instrument[24] in the following terms:

Count 1

Date of the offense: after the Fall Fiesta held November 10, 2001 but before Christmas of 2001 on a date the victim attended gymnastics.

Time of the offense: unknown

Location of the offense: on the "rod floor" of Esprit Gymnastics located at 7106 Crossroads Blvd., Suite 226, Brentwood, Williamson County, Tennessee

Nature of the offense: digital penetration

. . . .

Count 3

Date of the offense: Fall of 2001 before the Fall Fiesta held on November 10, 2001 on a date that the victim attended gymnastics.

Time of the offense: unknown.

---

[24] After the three child rape charges were severed from the trial, the remaining counts were renumbered and submitted to the jury. In this issue, our references are to the numberings of counts in the original charging instrument.

Location of the offense: on the "rod floor" of Esprit Gymnasium located at 7106 Crossroads Blvd., Suite 226, Brentwood, Williamson County, Tennessee

Nature of the offense: digital penetration

. . . .

Count 5

Date of the offense: June of 2001 through March of 2002 on a date that the victim attended gymnastics.

Time of the offense: unknown

Location of the offense: on the "rod floor" of Esprit Gymnasium located at 7106 Crossroads Blvd., Suite 226, Brentwood, Williamson County, Tennessee

Nature of the offense: digital penetration

The State-supplied bill of particulars for the aggravated sexual battery offenses in Counts Two, Four, and Six of the original charging instrument mirrored the particulars for Counts One, Three, and Five. That is, the State particularized the offense in Count Two in terms identical to Count One, including listing the nature of the offense as digital penetration; it particularized the aggravated sexual battery offense in Count Four in terms identical to Count Three, including listing the nature of the offense as digital penetration; it particularized the aggravated sexual battery offense in Count Six in terms identical to Count Five, including listing the nature of the offense as digital penetration.

Trial court rulings addressing joinder and severance of offenses, pursuant to Rules of Criminal Procedure 8, 13, and 14, are reviewed for an abuse of discretion. *State v. Goodwin*, 143 S.W.3d 771, 780 (Tenn. 2004); *Spicer v. State*, 12 S.W.3d 438, 442 (Tenn. 2000). As such, a trial court's decision to consolidate or to sever offenses will not be reversed unless the "court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn.1997)).

Aggravated sexual battery of a child under 13 years of age, T.C.A. § 39-13-504(a)(4) (2006), is a lesser included offense of rape of a child, *id.* § 39-13-522. *See State v. Elkins*, 108 S.W.2d 231, 237 (Tenn. 2003). Thus, the aggravated sexual battery charges in Counts Two, Four, and Six may well be lesser included offenses of the child rape charges set forth in Counts One, Three, and Five. Although it is unnecessary to allege lesser included offenses as separate counts in

an indictment, structuring an indictment in such a manner is not prohibited. *See State v. Banes*, 874 S.W.2d 73, 80 (Tenn. Crim. App. 1993).

The rape counts, however, are subject to mandatory joinder with the corresponding aggravated sexual battery counts. Tennessee Rule of Criminal Procedure 8(a)(1) mandates joinder of the offenses, as alleged, arising from the "same conduct or aris[ing] from the same criminal episode."[25] *See* Tenn. R. Crim. P. 8(a)(1)(A) (two or more offenses shall be joined in the same indictment if they are "based on the same conduct or arise from the same criminal episode"); *Banes*, 874 S.W.2d at 80 n.7. Accordingly, the defense is correct that, as worded, Counts One and Two, Counts Two and Three, and Counts Four and Five met the criteria for mandatory joinder.[26]

Now, we must determine whether the trial court erred in severing the mandatorily joined child rape offenses from the offenses alleged in Counts Two, Four, and Six. Criminal Procedure Rule 8(a)(2) provides that a "defendant *shall not* be subject to separate trials for multiple offenses [qualifying for mandatory joinder] unless they are severed pursuant to Rule 14." Tenn. R. Crim. P. 8(a)(2) (emphasis added). Rule 14 provides that either the State or the defendant may obtain a severance of offenses that have been mandatorily joined when "appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." *Id*. 14(b)(2)(A). The State's professed concern that the videotapes might not be probative of the rape charges is insufficient to warrant severance, particularly considering that the defendant opposed the severance, thereby accepting the risk the videotapes might pose to the rape charges. Furthermore, the State has not articulated why a limiting instruction to the jury would not have preserved a fair determination of the defendant's guilt or innocence of each offense.

Finally, it strikes us that permitting the State to sever offenses in this manner is akin to the condemned practice "by some prosecuting attorneys of 'saving back' one or more charges arising from the same conduct or from the same criminal episode." *Id*. 8(a), Committee Comments; s*ee State v. King*, 717 S.W.2d 306, 307-08 (Tenn. Crim. App. 1986) (second indictment after trial was prevented by Rule 8, which prevented multiple trials on charges arising from the same conduct or from the same criminal episode). As the supreme court explained in *State v. Carruthers*, 35 S.W.3d 516 (Tenn. 2000),

---

[25] We reject the State's argument on appeal that the defendant failed to demonstrate that each count was part of the same criminal episode. We are not persuaded, in the context of charges originally consolidated in a single indictment and when it is the State's desire to alter the status quo by a severance of offenses, that the burden is on the defendant to make such a showing. At any rate, the State's particulars, as worded, appear to speak in lesser-included-offense terms, in which case it would be incumbent upon the State to demonstrate otherwise.

[26] Even so, the relationship of Counts One through Six to the remaining five counts fall within the realm of permissive joinder of offenses in Criminal Procedure Rule 8(b) based on partaking "of the same or similar character." *See* Tenn. R. Crim. P. 8(b)(1), (2) (two or more offenses may be joined in the same indictment if the offenses "constitute parts of a common scheme or plan" or if they "are of the same or similar character").

. . . The purpose of Rule 8 is to promote efficient administration of justice and to protect the rights of the accused. The rule clearly permits a subsequently returned indictment to be joined with a previous indictment where the alleged offenses relate to the same criminal episode. *See King v. State*, 717 S.W.2d 306 (Tenn. Crim. App. 1986). This practice, however, does have certain limitations which, as the comments note, safeguard an accused against prosecutorial abuse. For example, a prosecutor cannot simply decide to "save" charges on other offenses arising out of the same conduct until after a trial is had on the original charges. Obviously, this would result in multiple trials and prejudice the defendant. This concern, however, is not present in the case at hand because the subsequent indictments were returned well before the start of trial.

*Id*. at 573.

In summary, we hold that because of the rule-based severance errors in this case, the defendant may not be subjected to a separate trial for the child rape offenses. *See King*, 717 S.W.2d at 307-08 (remedy is to bar second trial).

## B. Double Jeopardy

Independent of the rules of criminal procedure, the severance ruling in this case has a constitutional dimension to which we now turn our attention.

The state and federal constitutions both provide that no person shall, for the same offense, be twice put in jeopardy of life or limb. U.S. Const. amend. V; Tenn. Const. art. I, § 10. Our supreme court has held that double jeopardy protects a defendant from (1) reprosecution for the same crime after an acquittal, (2) reprosecution for the same crime after a conviction, and (3) multiple punishments for the same offense. *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996); *see also North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 109 S. Ct. 2201 (1989). As we shall explain, in this case double jeopardy bars the State from prosecuting the defendant on the three severed rape charges.

The State is permitted to, and often finds it necessary to, allege broad time frames for a claimed offense when, for example, the "exact" date of the offense cannot be shown. In that situation, however, the rights of an accused to a unanimous jury verdict and to double jeopardy protection must be scrupulously observed. The usual precaution to assure jury unanimity is to require an election of offenses at the close of the proof. *See, e.g.*, *State v. McCary*, 119 S.W.3d 226, 241 (Tenn. Crim. App. 2003); *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). Protection from a subsequent prosecution, under the double jeopardy clause, attaches to the time frame alleged in the indictment or perhaps that is more narrowly specified in a bill of particulars. *State v. Anderson*, 748 S.W.2d 201, 203 (Tenn. Crim. App. 1985) ("defendant would be protected from a subsequent

prosecution, under the double jeopardy clause, for any claimed offense against an alleged victim in an indictment which specified the offense occurred within the times alleged in the indictment"), *overruled on other grounds* in *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993); *see State v. Steve Mosley*, No. 01C01-9211-CC-00345, slip op. at 12 (Tenn. Crim. App., Nashville, Sept. 9, 1993) (dismissing defendant's concern that he could be prosecuted for the same drug offense based on double jeopardy protection for offense within times alleged in the indictment); *State v. Kenneth N. Godwin*, No. 87-91-III, slip op. at 6 (Tenn. Crim. App., Nashville, May 24, 1988) (holding on double jeopardy grounds that defendant could never again be prosecuted for any sexual offense against the victim committed during the years 1983 and 1984); *see also State v Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (purpose of the bill of particulars is to provide the accused with sufficient information about the offense alleged in the indictment to permit the accused (a) to prepare a defense, (b) to avoid prejudicial surprise at trial, and (c) to enable the accused to preserve a plea of double jeopardy).

The foregoing constitutional principles dictate the conclusion that double jeopardy bars the State in this case from subsequently prosecuting the defendant for the rape offenses set out in Counts One, Three, and Five of indictment, which are included both within the broad time frame alleged in the indictment and the time frame specified in the bill of particulars.

Accordingly, we hold that retrial on Counts One, Three, and Five is barred by both the Rules of Criminal Procedure and constitutional double-jeopardy principles.

## VII.  EVIDENCE CHALLENGES

The defendant claims that on five specific occasions, the trial court permitted the State to introduce prohibited hearsay and opinion testimony.  In addition, the defendant contends that the trial court, on four separate occasions, excluded legitimate defense evidence.  We discuss each occasion in turn.

### A.  Victim's Hearsay Testimony

On direct examination, B.R. testified that when her mother asked her if the defendant had touched her inappropriately, she replied, "Yes mom, he did."  B.R. further testified, "And I told her and she was - she was - she kind of felt like something like that was going on."  The State then asked, "Did your mom tell you that after you told her?"  When defense counsel objected on hearsay grounds, the State argued that the evidence was not offered for the truth of the matter asserted but to clarify B.R.'s previous statement.  The trial court allowed B.R. to answer the question, and B.R. testified that her mother did tell her that she felt "that something was happening."

We first address our standard of review of the trial court's ruling on the hearsay issue. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c). Hearsay is not admissible unless admission is authorized by the evidence rules or by other controlling provisions of law.  *Id*. 802; *see id*. 803 (establishing hearsay exceptions that do not

depend upon a showing of declarant's unavailability); *id*. 804 (establishing hearsay exceptions that depend upon a showing of declarant's unavailability). Accordingly, a trial court's ruling on whether a statement is hearsay is a question of law, and the appellate court reviews the issue de novo without a presumption of correctness. *See Shelia Rae Gibbs v. Robin Media Group*, No. M1999-00820-COA-R3-CV, slip op. at 3 (Tenn. Ct. App., Nashville, Aug. 25, 2000); *Russell v. Crutchfield*, 988 S.W.2d 168, 170 (Tenn. Ct. App. 1998).

The victim's statement is suggestive of hearsay. Moreover, if we adopted the State's argument that the statement was not offered for its truth but that it "illustrat[ed] the victim's basis of knowledge about her mother's suspicions," then the statement is not relevant according to Tennessee Rule of Evidence 401. *See* Tenn. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); *id*. 402 ("Evidence which is not relevant is not admissible."). In most cases, if a statement is not offered for its truth, an issue of relevancy is prompted. In the present case, B.R. testified that her mother had suspicions, and the State asked B.R. if her mother told her of those suspicions to clarify her testimony. The basis of B.R.'s knowledge about her mother's suspicions is inadmissible as irrelevant to whether the defendant sexually abused B.R. However, because the statement is not central to the case and not damaging to the defendant, we hold the error is harmless. *See* Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

## B. Detective Breedlove's Opinion Testimony

Detective Breedlove testified that he was present for two interviews with B.R. prior to trial and that he was present during her testimony at trial. The State asked, "Detective, when you reflect on all three of those interviews [sic] were her statements regarding the incidents involving [the defendant] consistent or inconsistent?" Defense counsel objected, stating that Detective Breedlove was not entitled to give his opinion in that regard. The State argued that because B.R's credibility was attacked on cross-examination, the State could ask about her statements' consistency. The State further argued that a lay witness, with "personal knowledge or personal observation," may express his or her opinion, if that opinion "would assist the jury in the ultimate decision of fact." The trial court overruled the objection and stated that the criteria in Tennessee Rule of Evidence 701 had been met. Therefore, Detective Breedlove testified that B.R.'s three statements were consistent. Furthermore, he stated that "she told the same thing over and over again."

The defendant claims on appeal that the trial court erred in admitting this evidence because "no rule of criminal procedure or rule of evidence allows a lay witness to give an opinion as to the consistency or inconsistency of someone else's statement." The defendant makes the blanket statement that the testimony "constitutes hearsay, violates the expert opinion rule, invades the function of the jury and is unknown as an evidentiary proposition." The only authority cited in his brief, however, is Tennessee Rules of Evidence 801 and 803. *See* Tenn. R. Evid. 801, 803. At trial, the defendant objected on lay opinion grounds only, and in the motion for a new trial and on appeal, a party is bound by the ground asserted when the party objected at trial, *State v. Adkisson*,

899 S.W.2d 626, 634-635 (Tenn. Crim. App. 1994); *see also* Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context."). Therefore, the only claim that survives the trial process regards Rule 701, opinion testimony by a lay witness. *See* Tenn. R. Evid. 701.

However, the defendant fails to cite authority to support his claim based on Rule 701. Tennessee Rule of Appellate Procedure 27(a)(7) states, "The brief of the appellant shall contain . . . [a]n argument . . . with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on . . . ." Tenn. R. App. P. 27(a)(7). Furthermore, Tennessee Court of Criminal Appeals Rule 10(b) states, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Therefore, the defendant waived this issue.

### C. B.R.'s Mother's Opinion Testimony of B.R.'s Truthfulness

B.R.'s mother testified that she observed Detective Breedlove's September 10, 2002 interview of B.R. At trial on direct examination, the following occurred:

Q. During the course of that interview, did anything strike you about [B.R.'s] demeanor?

A. Her demeanor?

Q. While she was discussing things?

A. While she was discussing things that were happening, that had happened to her, it - I just felt sick. I knew that she was being totally honest. She was telling him exactly what happened.

Defense counsel objected, stating that the jury must decide if B.R. was being truthful. The trial court stated that the answer responded to a "question about demeanor." Defense counsel argued that the answer exceeded the scope of the question. The trial court overruled the objection, and B.R.'s mother further testified that she felt B.R. acted "somber," "uncomfortable," "awkward," "silly, and not like herself at all."

The defendant claims that the trial court erred by admitting B.R.'s mother's testimony; however, we decline to reach the merits of this issue because the defendant waived it by failing to cite to authority in his brief. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). The defendant states that "this [testimony] is an opinion as to the veracity or credibility of another person" and that "[t]his sort of testimony is an opinion not permitted by a lay witness," yet he fails to cite any rule or case law to support his contention. Therefore, the issue is waived.

### D. B.R.'s Mother's Opinion Testimony of B.R.'s Reluctance to Disclose

On B.R.'s mother's redirect examination, the State asked, "Why do you think [B.R.] didn't tell you?" Defense counsel objected on speculation grounds. The State decided to rephrase the question after "build[ing] a foundation." B.R.'s mother described her "close relationship" with her daughter, testifying that she had insight into her daughter's behavior. The State then asked, "Do you feel that that insight may help the jury understand why [B.R.] didn't disclose at an earlier time?" Defense counsel again objected on speculation grounds and improper lay opinion testimony. The trial court overruled the objection based on Tennessee Rule of Evidence 701. B.R.'s mother then answered the question, stating that B.R. "was afraid."

On appeal, the defendant merely states that this evidence was speculation testimony without citing any authority, and he argues that it constituted improper lay opinion testimony under Tennessee Rule of Evidence 701. *See* Tenn. R. Evid. 701. Lay witnesses may give testimony in the form of an opinion where the testimony is "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." *Id.* 701(a). The testimony is not objectionable merely because it embraces an ultimate issue before the jury. Tenn. R. Evid. 704. However, the admission of lay opinion testimony is limited to those situations wherein the jury could not readily draw its own conclusions on the ultimate issue, without the aid of the witness's opinion testimony. *Blackburn v. Murphy*, 737 S.W.2d 529, 533 (Tenn. 1987). Put another way, the lay witness may express an opinion to describe her observations if that is the only way in which she can effectively communicate her observations to the jury. *State v. Brown*, 836 S.W.2d 530, 550 (Tenn. 1992). When the admission or exclusion of opinion evidence is challenged on appeal, it is reviewable only for abuse of discretion. *See, e.g., State v. Gray*, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997).

Here, the trial court did not abuse its discretion in allowing B.R.'s mother's testimony. Her opinion was rationally based on her perception and helpful to a clear understanding of her testimony. The State adequately built a foundation, demonstrating the close relationship between B.R. and her mother and the latter's insights into B.R.'s behavior. Furthermore, defense counsel ably attacked B.R.'s credibility on cross-examination and clearly pointed out to the jury that B.R. waited months before telling her mother of the abuse. B.R. testified that she did not immediately tell her mother because she was afraid that she would get in trouble. B.R.'s mother's opinion reiterated the victim's testimony.

### E. Defendant's Excluded Testimony

#### 1. Defendant's Statements Regarding Gymnastic Routines

During defense counsel's cross examination of B.R., the following exchange took place:

Q. Now [B.R.], during this time before you got injured were there some routines that you were having problems with?

A. What do you mean by routines?

Q. Some skills?

A. Yes.

Q. What was that?

A. Back handspring.

Q. The back handspring?

A. On the beam.

Q. On the beam?

A. Yes.

Q. [The defendant] had told you, did he not, if you couldn't do that -

A. (Inaudible).

Q. That you could not move on to the next level?

The State objected on hearsay grounds, and defense counsel argued that the question goes to B.R.'s state of mind, "her motivation." The State responded that the question must go to the declarant's state of mind, and the trial court sustained the objection.

After the ruling, cross-examination continued, as follows:

Q. Did you have trouble doing – what did you call it, the back –

A. Handspring.

Q. Back handspring?

A. Yes.

Q. And you could not move on to the next level until you did that; right?

-43-

A. Right.

Q. How long had you been trying to do that? And I understand it is
a very hard routine?

A. A very long time.

Q. It's hard; isn't it?

A. Yes.

Q. But you couldn't move up to the next level until after you got that
done; right?

A. Right.

The defendant contends that "[t]his question and answer was designed to show the state of mind and effect that the statement had on the alleged victim." He further argues that the trial court "erroneously sustained the objection as being 'hearsay.'" The defendant, however, fails to cite authority in his brief. Therefore, he waived the issue. *See* Tenn. R. App. P. 27(a)(7) ("The brief of the appellant shall contain . . . [a]n argument . . . with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on . . . ."); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Waiver aside, we will discuss the issue to elaborate on an evidentiary point stated earlier. Again, "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Tenn. R. Evid. 801(c), and it is not admissible unless admission is authorized by the evidence rules or by other controlling provisions of law, *id.* 802. A trial court's ruling on whether a statement is hearsay is a question of law, and the appellate court reviews the issue de novo without a presumption of correctness. *See Shelia Rae Gibbs*, slip op. at 3; *Russell*, 988 S.W.2d at 170.

Here, the statement that the defendant told B.R. she could not move to the next gymnastic level unless she could perform the back handspring was not offered for its truth. Instead, we surmise that the defendant offered the evidence to show circumstantially that friction developed between B.R. and the defendant regarding gymnastic skills. Hearing that the defendant told B.R. that she may not advance in her sport, the jury could have inferred that the defendant's and B.R.'s relationship was strained for reasons other than sexual abuse. Thus, the importance of the statement lies in the fact that it was said, not its truth. Because the statement was not hearsay and was relevant, it was admissible.

-44-

That being said, however, we find that the error in not admitting the statement was harmless. *See* Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). After the trial court sustained the State's objection, defense counsel ably elicited from B.R. that she was aware that if she failed to do the skill, then she would fail to advance to the next gymnastic level. Furthermore, the jury heard testimony that the defendant had become so angry when B.R. refused to do the back handspring that he left the gymnasium. From this evidence, the jury could likewise infer that the defendant's and B.R.'s relationship was strained for reasons other than sexual abuse. Because the testimony is essentially the same, "considering the whole record," this error did not prejudice the defendant, and we find, therefore, the error harmless. Tenn. R. App. P. 36(b); *see* Tenn. R. Crim. P. 52(a).

### 2. Defendant's Statements Regarding Digital Camera

On direct examination, the defendant testified that the police seized several videotapes, including digital tapes, from his apartment. When asked "[w]hat tape was in the digital camera," the defendant replied:

> Well, what happened was, is that [Detective Breedlove] asked some questions: Are we going to see any pornographic something or another. I don't even remember exactly what he said.
>
> And I said: I don't believe so.
>
> And he said: Well, can we just play it?
>
> So I went over there and showed him how to play it.

The State objected on hearsay grounds, and the trial court sustained the objection, instructing the jury to disregard what the defendant told Detective Breedlove.

In the defendant's brief, he claims that his statement was not hearsay because it "was designed to deal with issues concerning what [he] knew or information he told the detective himself." We refuse to reach the merits of this issue because the defendant, again, failed to cite authority and therefore waived the issue. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

### 3. Defendant's Statements Denying Guilt

Also on direct examination, the defendant testified that after the search of his apartment, he accompanied Detective Breedlove to the police department and gave a statement. Then defense counsel asked, "In that statement, did you admit – ." The State interrupted defense counsel and objected on hearsay grounds. The trial court instructed defense counsel to finish his question, and defense counsel inquired, "In your conversation with Detective Breedlove, did you

admit to any inappropriate touching of [B.R.]?" The State renewed its objection, and the trial court sustained the objection.

The defendant argues, rather confusingly, that "[g]iven the nature of the questions about the conversation and as to what [the defendant] said and what the detective said, the fact that [the defendant] denied his guilt was clearly not hearsay." The defendant cites no authority in his argument; thus, he waived the issue. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

### F. Ms. Melton's Excluded Testimony

On direct examination, Ms. Melton testified that in July of 2002, B.R. was afraid to do a back handspring on the beam. Ms. Melton testified that the defendant "got really tough on her" and that B.R. "was crushed." Ms. Melton stated that B.R.'s mother "was mad and upset with [the defendant]." At this point, the State objected on hearsay grounds, and the trial court sustained the objection, instructing the jury to disregard the statement regarding B.R.'s mother. Ms. Melton then testified that from that day forward, B.R. refused to look at the defendant, hug him, or talk to him. She testified that B.R. "kept coming up with excuse, after excuse, after excuse, of why she didn't - couldn't do gymnastics." Ms. Melton testified that the back injury may have been legitimate, but she did not believe that it was. She testified, "I just never believed it was, not by the way her parents responded or anything else." The State objected, stating no basis, and the trial court sustained the objection.

On appeal, the defendant contends that the trial court erroneously sustained the objections and "failed to permit [Ms. Melton] to testify as to conversations that she had with the alleged victim which expressed the victim's demeanor." The defendant also claims that Ms. Melton's testimony on this issue was critical to impeach B.R.'s testimony. First, we recognize that the record does not evidence any conversations between Ms. Melton and the victim regarding this issue. Ms. Melton admitted on cross-examination that she did not personally witness the occurrence in July 2002. Second, the defendant failed to cite authority in his argument, and therefore, he waived the issue. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

### VIII. IMPROPER CROSS-EXAMINATION OF DEFENDANT

The defendant contends that the trial court erred by allowing the State to improperly cross-examine him regarding voice stress analysis relating to his voice on the "perp phone call." The following testimony transpired on cross-examination:

Q. Wouldn't you agree that someone that is shocked or caught off guard, that fact can be detected in their voice?

A. I wouldn't necessarily agree with that.

Q. Have you ever heard of voice stress analysis?

A. I've heard of the concept. I've heard of it, yes.

Q. Are you aware that people can take a recording like this and determine whether or not someone is under stress, similar to that of a lie detector?

A. I don't know anything about it.

Defense counsel objected to this line of questioning on relevance grounds, and the State argued, "It's relevant if [the defendant] is aware of [voice stress analysis] and still believes that stress cannot be heard in someone's voice." The trial court overruled the objection, and the defendant stated that he was not aware that law enforcement agencies could use this tool to detect distress in a person's voice.

To be sure, the propriety, scope, manner, and control of cross-examination rests within the sound discretion of the trial court. *See State v. Hutchison*, 898 S.W.2d 161, 172 (Tenn. 1994); *State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). Absent a clear abuse of this discretion that results in manifest prejudice to the accused, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984). In addition, "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Tenn. R. Evid. 611(b).

In the present case, the defendant argues that the trial court erred in allowing cross-examination regarding "voice stress analysis" because it was irrelevant similar to how polygraph evidence is irrelevant. *See State v. Damron*, 151 S.W.3d 510, 515 (Tenn. 2004) (stating that "polygraph test results, testimony concerning such results, and testimony concerning a defendant's willingness or refusal to submit to a polygraph test are inadmissible"). In our opinion, the State's cross-examination was misleading, factually incorrect, and irrelevant; it should not have been allowed.

From reported case law on the subject of voice stress analysis, we glean the following:

The premise on which voice stress analysis is based is that all speech is comprised of t[wo] components. The first are fundamental frequencies determined mainly by laryngeal structures. The second are formant frequencies that are produced when air is passed through the vocal tract. Voice stress analysis analysts believe speech also produces an inaudible FM signal, or micro-tremor, of 8 to 14 Hz. The belief is that this signal's presence is greatest during normal speech and dampened when a person is placed under stress. A voice stress instrument is designed to monitor and display the variance in microtremors as a person responds to specific questions.

-47-

*Smith v. State*, 797 So.2d 503, 524 n.5 (Ala. Crim. App. 2000). Additional enlightenment on the subject appears in *United States v. Traficant*, 566 F. Supp. 1046, 1046 (E.D. Ohio 1983).

> . . . Voice stress analyzers and psychological stress evaluators (PSE) detect and measure subaudible microtremors in a person's voice. The amount of stress imposed on the speaker is alleged to affect the microtremors in his voice. The stress is allegedly produced by the speaker's deception. The first psychological stress evaluator was marketed in 1971. Reportedly, it was developed as a covert lie detection device which could be used without the attachment of sensors (as are necessary with polygraph tests) and hence could be employed without the knowledge of the subject being tested.
>
> . . . .
>
> . . . The opinion of at least one researcher in the field is that there have been very few well-controlled studies of the reliability of voice stress analysis; and none of these studies have shown that voice stress analyzers are effective in detecting deception. Several studies revealed that PSE testing results yielded an accuracy rate only slightly higher than, and in some cases lower than, chance expectancy rates.

566 F. Supp at 1046-47. *See Virgin Islands v. Leycock*, 19 V.I. 59 (D. Virgin Ils. 1982) (commenting that the test is "probably viewed by courts with even greater disdain than lie detector (polygraph) tests").

Against this background, prosecution counsel's assertion "that people can take a recording like this and determine whether or not someone is under stress, similar to that of a lie detector" imports to the jury some notion of infallibility that simply does not exist. We fail to detect any relevancy to this misleading line of questioning about an unreliable analysis with no proven track record of accuracy. We reject outright the State's argument that the voice stress analysis questions were relevant to impeach the defendant's credibility. The defendant simply maintained that he "wouldn't necessarily agree with" the State's assertion "that someone that [sic] is shocked or caught off guard, *that fact can be detected in their voice*." This court, most assuredly, disputes the State's assertion; indeed, this court has found nothing to support the state's factual assertion.

The question thus becomes whether the improper cross-examination constitutes reversible error. We believe it does not. In our view, the improper cross-examination neither "affirmatively appear[s] to have affected the result of the trial on the merits," Tenn. R. Crim. P. 52(a), nor "involve[s] a substantial right" of the defendant, Tenn. R. App. P. 36(b).

# VIII. AND IX. JURY INSTRUCTION

The defendant raises two issues regarding the same jury instruction. The instruction given by the trial court, in pertinent part, is as follows:

> For you to find the defendant guilty of [aggravated sexual battery], the State must have – must have proven, beyond a reasonable doubt, the existence of the following essential elements: (1) The defendant had unlawful sexual contact with the alleged victim, in which the defendant *intentionally* touched the alleged victim's intimate parts, or the clothing covering the immediate area of the alleged victim's intimate parts; or the alleged victim had unlawful sexual contact with the defendant in which the victim *intentionally* touched the defendant's or any other person's intimate parts or the clothing covering the immediate area of the defendant's, or any other person's intimate parts; and that the alleged victim was less than 13 years of age, and that the *defendant acted either intentionally, knowingly or recklessly*.

(Emphasis added.)

"[The] defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). The trial court must describe each element of an offense and define the element in connection with that offense. *See State v. Cravens*, 764 S.W.2d 754, 756 (Tenn. 1989). A charge is prejudicial error if it fails to "submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997).

First, the defendant states that "recklessness" modifies the age of the victim and that the trial court failed to explain that the mens rea of recklessness was only applicable to this element and not the nature of conduct element. Thus, he argues that the instruction violates the burden of proof requirement, *see* T.C.A. § 39-11-201 (2006), his federal and state due process rights, and his rights to a jury trial because the instruction stated that aggravated sexual battery could be committed if the "defendant acted either intentionally, knowingly or recklessly."

Second, the defendant states that the trial court instructed the jury that the State could prove the required mental state for aggravated sexual battery in the disjunctive. He contends that the use of the disjunctive "allowed a verdict to be returned which was not unanimous . . . in violation of [his] federal and state rights to a jury trial and the right to a unanimous verdict."

Similar to the disjunctive jury instruction in *State v. Chester Wayne Walters*, No. M2003-03019-CCA-R3-CD, slip op. at 12-15 (Tenn. Crim. App., Nashville, Oct. 4, 2004), the present case's jury instruction specifically stated that it required the jury to find that the sexual contact was intentional. *See State v. Faulkner*, 154 S.W.3d 48, 58-59 (Tenn. 2005) (stating that the

-49-

court is not convinced that inclusion of an instruction defining the nature-of-conduct and circumstances-surrounding-conduct is an error of constitutional dimension when the instruction also includes the correct result-of-conduct definition). Further, the defendant's reliance on *State v. Deji A. Ogundiya* is not convincing, *see* No. M2002-03099-CCA-R3-CD, slip op. at 6-7 (Tenn. Crim. App., Nashville, Feb. 19, 2004), because this court did not state that the trial court's instructions constituted reversible error. We instructed that upon retrial for other reasons, the trial court should instruct the jury carefully regarding the mens rea for each element of the offense. *Id.* This court noted that the trial court did not instruct the jury clearly as to the mens rea of each element of sexual battery and did not explain to the jury that the recklessness mens rea only applied to the victim's lack of consent element. *Id.* Unlike *Deji A. Ogundiya*, the trial court's instruction in the present case did not constitute reversible error.

## X. RECUSAL OF TRIAL JUDGE

The defendant claims that the denial of his motion to disqualify the trial judge was error. Prior to the scheduled hearing on the defendant's motion for new trial, substitute counsel, who appeared in the case after the conclusion of the trial, filed a written motion seeking the trial judge's recusal. Apparently, this motion was reviewed by the court along with the motion for new trial and other pending motions. The recusal issue did not receive any specific attention in the hearing conducted by the court, and the court apparently disposed of the recusal issue, along with other issues, by generally stating that such "other matters" were overruled.

The primary ground for disqualification cited by the defendant in his recusal motion was the trial judge's attempt to have the defendant's trial counsel, who withdrew following the trial, disciplined by the Board of Professional Responsibility. Based upon exhibits attached to the recusal motion, the defendant's trial attorney was interviewed by television reporters following the return of the jury's guilty verdicts in the present case. In the course of the interview and in response to questions posed by the reporters, counsel stated that an appeal would ensue and that the grounds for the appeal would include the trial court's ruling on the admission into evidence of the videotape of the defendant in the gymnasium's restroom. Counsel opined that the ruling was "wrong" and would be the basis of reversal. The trial judge essentially complained to the Board of Professional Responsibility that counsel's statements had impugned the judge's integrity, but after counsel responded to the complaint, the Board dismissed the complaint. In his motion to disqualify the trial judge, the defendant claimed that the judge's actions in seeking disciplinary sanctions against his trial attorney, along with his restrictive rulings on pretrial disclosure and his interrogation of witnesses during trial, bespoke a prejudice against the defendant that warranted disqualification.

The issue of a trial judge's recusal based upon alleged bias or prejudice rests within the discretion of the trial court. *Caruthers v. State*, 814 S.W.2d 64, 67 (Tenn. Crim. App. 1991). A judge should grant a motion for recusal whenever his or her "impartiality might reasonably be questioned." Code of Judicial Conduct, Canon 3(E)(1); *see State v. McCary*, 119 S.W.3d 226, 260 (Tenn. Crim. App. 2003). This court will not interfere with the trial court's discretion unless clear

abuse appears on the face of the record. *Owens v. State*, 13 S.W.3d 742, 757 (Tenn. Crim. App. 1999); *Caruthers*, 814 S.W.2d at 67.

Tennessee Supreme Court Rule 10, Canon 3(E)(1) provides that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where [] the judge has a personal bias or prejudice concerning a party." Tenn. Sup. Ct. R. 10, Canon 3(E)(1)(a), (b). In response to a disqualification motion, the judge should not only examine "subjective bias" but should also inquire whether the judge's impartiality might be reasonably questioned under an "objective standard." *State v. Connors*, 995 S.W.2d 146, 149 (Tenn. Crim. App. 1998). The latter standard "'takes into account that disqualification is required if there is an appearance of partiality to the reasonable observer, and it precludes a judge from avoiding recusal merely by avowing his or her impartiality.'" *State v. Conway*, 77 S.W.3d 213, 225 (Tenn. Crim. App. 2001) (quoting *Connors*, 886 S.W.2d at 149).

In the present case, we are struck by a combination of events: (1) the judge's punitive reaction toward trial counsel's relatively benign, though extrajudicial, comments about trial error; (2) the judge's failure to place on the record his findings and reasons for denying the motion to recuse; (3) the judge's restrictions on the defendant's right of discovery; and (4) the judge's credibility-bolstering examination of the victim-witness, though itself unworthy of a reversal.

To elaborate, first, the judge's questioning of the victim during her trial testimony could appear to be for the purpose of eliciting her disavowals that her testimony was influenced or coached. Second, the reaction to counsel's post-trial comments evinces, at worst, an antipathy toward the defense or the defense attorney and, at best, a pharisaical attitude toward dissent that might tend to chill all but the most intrepid advocacy. Last, against this backdrop, we would have hoped that the trial judge would have made findings in support of his denial of the motion to disqualify. Such findings may well have addressed many of our concerns emerging from the circumstances described above. The court, however, entered no findings, a lapse that hardly serves to dispel a claim that the judge's partiality is reasonably in doubt.

Given the totality of circumstances, we hold that the trial judge is disqualified from conducting further proceedings in this case.

## XI.  SENTENCING

In the defendant's final issue, he argues that the trial judge unlawfully applied the enhancement factors, that consecutive sentencing was not appropriate, and that the length and manner of service were illegal because the court failed to require the State to produce the "raw data" upon which the State's expert relied.

At the sentencing hearing, the State first entered into evidence the Presentence Investigation Report and an Addendum to this report as exhibits one and two. The Presentence Report showed that the defendant had no prior criminal record, and it also contained a psychosexual

evaluation and a letter from a former student, detailing her need for counseling after being coached by the defendant. The Addendum contained information submitted by the State and the defendant. The State's information included: B.R.'s statement, B.R.'s parents' statement, a letter from parent's of a former student, polygraph test results, and a letter from B.R.'s counselor. The defendant's information included: a list of mitigating factors, the defendant's written statement, USA Gymnastics documents regarding a 1996 investigation of the defendant, polygraph test results, and numerous favorable letters from the defendant's family and friends.

The State then called Dr. Donna Moore as a witness. She testified, over objection, that she held a doctorate degree in psychology, and she worked at Centerstone Community Mental Health Center. She has practiced the treatment of sex offenders since 1993, and she evaluated the defendant. Doctor Moore testified that after performing several tests on the defendant, she concluded that the defendant was a high risk for re-offending and that "he was not [amenable] to treatment." She further explained that the overall data indicated that the defendant was dishonest and lacked empathy.

Detective Breedlove testified that the police found pornographic material, which showed females who "appear[ed] to be either 17, 18 years of age or a little younger." He testified that the females "were dressed in a younger fashion with pigtails" and were engaging in sexual intercourse or "various . . . sexual actions."

Detective Breedlove also testified that the police seized various videotapes from the defendant's apartment. On these videotapes, the defendant had focused on B.R.'s vaginal area approximately 248 times, even at times when she was not performing a gymnastics skill. Detective Breedlove also testified that the defendant focused on the vaginal area of two other minor students. When he questioned one student, the student said that the defendant had touched the outer clothing of her vaginal area on one occasion, but he apologized, and she forgave him.

B.R.'s father testified at the sentencing hearing that B.R. had difficulties in school and nightmares that the defendant was chasing her to touch or kill her. He testified that she also has been ridiculed for coming forward, and she does not understand why certain adults have not believed her.

B.R.'s mother testified that the sexual abuse occurred for about one year. She testified that, as a result, B.R. "had severe nightmares." She would wake up crying because she dreamed that the defendant would touch other people while she had to watch. B.R.'s mother testified that B.R. is afraid to go out on her own, and she is seeing two counselors. She started seeing them every week and then on an "as needed" basis. B.R.'s mother testified that, since the defendant's conviction, "things have been a little bit better for [B.R.]" She is not as quick to anger, and she is improving in school.

The defendant then called Dee Ann Melton as a witness. She testified that Detective Breedlove interviewed her daughter and that no charges resulted from the interview. She stated that she had never observed the defendant improperly touching a student.

On cross-examination, Ms. Melton testified that she wrote a letter on the defendant's behalf. Ms. Melton admitted that she had seen the videotapes of B.R.'s vaginal area and of the defendant taping himself using the bathroom. The State asked her if she told someone that the garbage bag was placed around the camera to "catch little boys who had been peeing on the floor." She replied, "[M]adam, I don't know what I told her because I talked to – actually, I'm pretty tired of talking about it all, and I don't know what I said." Ms. Melton also stated that she did not recall telling someone that the defendant may have inappropriately touched B.R., but she did not think it warranted a 96-year sentence.

The defendant called August Boto, Karen Schiefelbein, and Mim Young Kwon as character witnesses. The defendant also called Dr. Jim Walker as his expert witness. Doctor Walker testified that he was licensed to practice psychology in Tennessee and that he was employed at Vanderbilt University School of Medicine. He testified that he disagreed with Dr. Moore's assessment that the defendant was a high risk to re-offend. After conducting his own tests, Dr. Walker concluded that the defendant had a low to moderate risk for re-offending. He also stated that he could not answer whether the defendant could be rehabilitated because the defendant refused to discuss what he was convicted of because of his Fifth Amendment rights. Doctor Walker stated that, in his opinion, the defendant was treatable for inappropriate sexual behavior and was a good candidate for treatment provided that he acknowledge his need for treatment. Doctor Walker further testified that he would diagnose the defendant as a pedofile, but not a predatory pedofile, unlike Dr. Moore's opinion.

The defendant made an allocution statement. Defense counsel informed the court that the defendant would not be placed under oath during the statement. The defendant thanked his friends and family for their support and stated that the victim's family members were "people of character and high moral[] fiber." He "lament[ed] over the emotional trauma this must have caused the entire . . . family." He stated that he had compassion for them and expressed "deep sorrow" for what they were going through and to anyone else "who [thought] that [he] hurt them."

The court found the trial evidence "highly significant . . . much more significant than what either of the doctors have said, or not said, in their testimony." Therefore, the trial judge stated that he did not consider the State's expert's report. The court also found that B.R.'s, Detective Breedlove's, and Lucy Fox's testimonies were credible and that the defendant's testimony was deceptive.

In making the sentencing determinations, the trial judge stated that he considered the testimony, Presentence Investigation Report, Addendum, and letters on the defendant's behalf. The court found a lack of potential for rehabilitation based on the defendant's testimony and conduct. Regarding this conduct, the trial judge stated, "[T]he criminal conduct was reprehensible in this

court's judgment[,] and it was conduct that was explicitly intertwined with a pattern of deception that used the gymnastic sport to its most profane detriment." Furthermore, the court found residual mental damage to the victim and stated that, because of the defendant's refusal to accept responsibility, there is no potential for rehabilitation.

Regarding enhancement factors,[27] the trial court found that the defendant abused his position of public or private trust and that he also used a special skill that facilitated the commission of the offense. *See* T.C.A. § 40-35-114(16) (2006). He applied this enhancement factor to each aggravated sexual battery conviction and to the aggravated sexual exploitation of a minor conviction. The trial judge also found that the defendant committed the aggravated sexual exploitation of a minor offense to gratify his desire for pleasure or sexual excitement. *See id.* § 40-35-114(8).

The court rejected the mitigating factor that substantial grounds existed to excuse or justify the defendant's conduct, *see* T.C.A. § 40-35-113(3) (2003), and the court placed "negligible" weight on the mitigating factor that the defendant did not cause substantial bodily injury, *see id.* § 40-35-113(1). Regarding the defendant's lack of criminal record, *see id.* § 40-35-113(13), the court stated that it may, but is not required to, consider that mitigating factor, and the trial judge further stated that he will not consider this factor because the defendant was in a position of trust.

Thus, the trial court sentenced the defendant to a maximum incarcerative sentence of 12 years for each of the seven counts of aggravated sexual battery and to 12 years in the Department of Correction for the one count of aggravated sexual exploitation of a minor, stating that confinement was necessary "to avoid depreciating the seriousness of the offense[s]." The court also ordered that the sentences run consecutively according to *State v. Lane*, 3 S.W.3d 456 (Tenn. 1999), and Tennessee Code Annotated section 40-35-115(b)(5), *see* T.C.A. § 40-35-115(b)(5) (2006).

When the length, range, or manner of service of a sentence is disputed, it is generally the duty of this court to conduct a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant, and in the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely de novo. *Id.* If appellate review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must

---

[27]Tennessee Code Annotated section 40-35-114, as amended in 2002 by Public Act 849, § 2(c), effective July 4, 2002, added one enhancement factor and subsequently renumbered all of the original enhancement factors in the statute. Thus, for the time period during which the defendant's offenses were committed and during which he was sentenced, the enhancement factor pertaining to abuse of public or private trust or used a special skill was *subsection (16)*, and the enhancement factor for committing the offense to gratify the defendant's desire for pleasure or excitement was *subsection (8)*. *See* T.C.A. § 40-35-114(8), (16) (2003). We note that the legislature has, again, recently amended and renumbered the enhancement factors, *see* T.C.A. § 40-35-114 (2006), but these changes became effective for criminal offenses committed on or after June 7, 2005, and do not apply in this case.

affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In addition, "[e]very defendant shall be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense, T.C.A. § 40-35-102(1) (2003), and "[t]he sentence imposed should be no greater than that deserved for the offense," *id*. § 40-35-103(2).

Furthermore, Tennessee Code Annotated section 40-35-501(i)(1) states in relevant part, "There shall be no release eligibility for a person committing an offense, on or after July 1, 1995, that is enumerated in subdivision (2)." *See* T.C.A. § 40-35-501(i) (2003). Subdivision (2) includes the offense of aggravated sexual battery. *See id*. "Such person," the statutory subsection continues, "shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained." *See id*. It also states that "no sentence reduction credits . . . shall operate to reduce the sentence imposed by the court by more than fifteen percent (15%)." *See id*.

The defendant challenges on constitutional right-to-jury-trial grounds the trial court's lengthening each sentence from the presumptive, minimum sentence of eight years to the maximum of 12 years.[28] The Tennessee Supreme Court has upheld the Act against a Sixth Amendment challenge, *see State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005); however, because the United States Supreme Court has recently filed an opinion that may freshly call into question the Tennessee law's constitutional soundness, *see Cunningham v. California*, No. 05-6551, 75 U.S.L.W. 4078 (Jan. 22, 2007),[29] we take the time to regain perspective. As we shall explain, we opt – at this juncture – to follow the precedent of the Tennessee Supreme Court.

In *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), the Supreme Court held that provisions of the Washington sentencing law violated Blakely's Sixth Amendment right to jury trial. Washington's Sentencing Reform Act established a top end sentence of ten years for Blakely's Class B felony but provided for a "standard range" of 49 to 53 months. Nevertheless, the law provided that the trial judge, without a jury, "*may* impose a sentence above the standard range if her she finds "substantial and compelling reasons justifying an exceptional sentence." *Blakely*, 542 U.S. at 299, 124 S. Ct. at 2535 (emphasis added). The Washington law enumerated a nonexhaustive list of aggravating facts upon which a judge could increase a sentence above the standard range. *Id*. Three years later, *Cunningham* characterized the Washington sentencing law

---

[28]To address the possibility that provisions of the Tennessee Criminal Sentencing Reform Act (the Act) violated the United States Constitutional Sixth Amendment right to trial by jury, the Tennessee General Assembly amended various provisions of the Act in 2005 by enacting Public Acts chapter 353. Because the 2005 amendments only apply to offenses committed on or after June 7, 2005, the provisions of the Act for purposes of the present case are unaffected by 2005 chapter 353.

[29]This opinion does not yet appear in the preliminary print of the United States Reports, and at this time, it is subject to formal revision. For that reason, our citations to this case will refer to the pages of the slip opinion, which has been released.

in *Blakely* as permitting "but . . . not requir[ing] a judge to exceed [the] standard range." *Cunningham*, slip. op. at 9.

In striking down Washington's provision for exceptional sentencing, the *Blakely* Court applied the rule of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000): "'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Blakely*, 542 U.S. at 301, 124 S. Ct. at 2536 (quoting *Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63). The Supreme Court emphasized that the relevant "statutory maximum" for purposes of the Sixth Amendment "is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Blakely*, 542 U.S. at 303, 124 S. Ct. at 2537 (emphasis in original). "In other words," the Court said, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id*. at 303-04, 124 S. Ct. at 2537 (emphasis in original). Because Blakely's sentence was increased above the prescribed standard range based upon the trial judge's finding of "'deliberate cruelty,'" a fact that was neither admitted by Blakely nor found by a jury, *id*. at 313-14, 124 S. Ct. at 2543, the statutory scheme for exceptional sentencing violated Blakely's Sixth Amendment right to trial by jury, *id*., 124 S. Ct. at 2543.

In *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), a case decided less than six months after *Blakely*, the Supreme Court held that the federal sentencing guidelines, as written, violated the Sixth Amendment because, like the Washington sentencing scheme addressed in *Blakely*, the federal "sentencing rules are mandatory and impose binding requirements on all sentencing judges." *Id.* at 233, 125 S. Ct. at 749-50. The *Booker* Court observed:

> If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. Indeed, everyone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the [Sentencing Reform Act] the provisions that make the Guidelines binding on district judges . . . . [W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.

*Id.*, 125 S. Ct. at 750.

Historically, we know that in the wake of *Blakely* and *Booker*, the Tennessee Court of Criminal Appeals determined in a number of cases now designated "Not for Citation," *see* Tenn.

R. Sup. Ct. 4(F), that *Blakely*'s principles invalidated Tennessee's provisions for the trial judge's enhancing a sentence above the "presumptive" sentence when he or she found factually that any statutory enhancement factors, other than that of a prior record of criminal convictions, applied. *See Gomez*, 163 S.W.3d at 654 (acknowledging that the intermediate court had held "in many decisions" that the principles of *Blakely* invalidated the Tennessee sentence-enhancement provisions); *see also* T.C.A. §§ 40-35-210(c) (establishing a "presumptive" sentence at the minimum sentence of the range for Class B, C, D, and E felonies), - 210(d) (providing for increasing a sentence above the presumptive sentence based on the finding of enhancement factors), & - 114 (enumerating enhancement factors) (2003) (amended 2005 Pub. Acts ch. 353, effective as to offenses committed after June 7, 2005). We also know that, later, the Tennessee Supreme Court held that the *Gomez* defendants' claim of unconstitutionality of Tennessee's scheme for enhancing sentences would not be recognized as plain error. *Gomez*, 162 S.W.3d at 661.

In *Gomez*, our supreme court rejected the intermediate appellate court's view of the matter. It stated, "*Booker* confirms that Tennessee's sentencing structure differs markedly and in constitutionally significant ways from the [federal sentencing] Guidelines and the New Jersey and Washington statutes at issue in *Apprendi* and *Blakely*." *Id.* at 658. The court said, "The [Tennessee Criminal Sentencing] Reform Act affords judges discretion to select an appropriate sentence within a predetermined statutory range[,]" *id*. at 659, and "the finding of an enhancement factor simply does not mandate an increased sentence," *id*. at 660; *see* T.C.A. 40-35-210(d), (e) (2003) (amended 2005). As such, the court described the Tennessee sentencing enhancement scheme "as an 'indeterminate,' non-mandatory, advisory sentencing scheme which merely requires judges to consider enhancement factors, along with other information, when exercising their discretion to select an appropriate sentence within the statutory range," a scheme that "does not *mandate* an increased sentence upon a judge's finding of an enhancement factor." *Gomez*, 163 S.W.3d at 660. Explaining further, the *Gomez* court said:

> [T]he relevant inquiry is whether the Reform Act mandates imposition of a sentence increased above the presumptive sentence when a judge finds an enhancement factor. Although the dissent [in *Gomez*] is correct that the Reform Act requires trial judges to determine whether enhancement factors exist [before an increase may be imposed], the dissent fails to recognize that the finding of an enhancement factor does not mandate an increased sentence. *Booker* explains that the mandatory increase of a sentence is the crucial issue which courts must consider in determining whether a particular sentencing scheme violates the Sixth Amendment.

*Id.* at 661.

We take the time to review these cases because the United States Supreme Court recently filed *Cunningham*, in which the Court took up the sentencing gauntlet thrown, this time, by the California Supreme Court's holding that California's determinate sentencing law survived Sixth

Amendment scrutiny intact under *Apprendi-Blakely-Booker*. The United States Supreme Court determined, however, that California's sentencing scheme violated Cunningham's right to jury trial as guaranteed by the Sixth and Fourteenth Amendments. The *Cunningham* Court outlined California's sentencing regime as follows:

> . . . The statute defining the offense prescribes three precise terms of imprisonment – a lower, middle, and upper term sentence. Penal Code § 1170(b) (West Supp. 2006) controls the trial judge's choice; it provides that "the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime." . . .
>
> . . . [T]he [State Judicial] Council's Rules provide that "[t]he middle term shall be selected unless imposition of the upper or lower term is justified by circumstances in aggravation or mitigation." . . . Facts aggravating an offense, the Rules instruct, "shall be established by a preponderance of the evidence," and must be "stated orally [by the trial court] on the record.
>
> The Rules provide a nonexhaustive list of aggravating circumstances . . . . In sum, California's [determinate sentencing law] and the rules governing its application, direct the sentencing court to start with the middle term, and to move from that term only when the court itself finds and places on the record facts – whether related to the offense or the offender – beyond the elements of the charged offense.

*Cunningham*, slip op. at 4-6. The *Cunningham* Court condemned the regime because it authorized the judge – not the jury – to find facts that permitted an upper term sentence of 16 years rather than the required 12-year middle term sentence. *Id.*, slip op. at 2.

In view of the *Gomez* court's focus upon the premise that Tennessee Code Annotated section 40-35-210 did not *require* the sentencing court to enhance a sentence above the presumptive sentence, even if enhancement factors were applicable, the *Cunningham* Court's *post mortem* comments about *Blakely* are intriguing. In summarizing *Blakely* above, we highlighted that opinion's description of a portion of the Washington sentencing law, specifically that "[a] judge *may* impose a sentence above the standard range if he finds 'substantial and compelling reasons justifying an exceptional sentence.'" *Blakely*, 542 U.S. at 299, 124 S. Ct. at 2535 (emphasis added). The *Cunningham* Court amplified the tone of that statement by stating that the infirm Washington law "permitted but did not require a judge to exceed [the] standard range." *Cunningham*, slip op. at 9. In a similar vein, the *Cunningham* Court stated that the Washington law did not merely afford the sentencing court a permissible ambit of discretion; a Washington judge "could not have sentenced Blakely above the standard range without finding the additional fact of deliberate cruelty." *Id.*, slip op. at 10. Perhaps galvanizing this theme, the *Cunningham* Court stated that *Blakely* held it

"irrelevant that the [Washington] Reform Act ultimately left the decision whether or not to depart [from the standard range] to the judge's discretion." *Id.*, slip op. at 11. The Court also quoted a *Blakely* footnote as follows: "'Whether the judicially determined facts *require* a sentence enhancement or merely *allow* it, . . . the verdict alone does not authorize the sentence.'" *Id.* (quoting *Blakely*, 542 U.S. at 305 n.8, 124 S. Ct. at 2538 n.8) (emphasis in *Blakely*).

Thus, *Cunningham* strikes at a basic premise of *Gomez. See Gomez*, 163 S.W.3d at 661 ("*Booker* explains that the mandatory increase of a sentence is the crucial issue which courts must consider in determining whether a particular sentencing scheme violates the Sixth Amendment."). Whether *Cunningham* applied the *coup de grace* to *Gomez* is yet somewhat perplexing, for at least two reasons.

First, *Cunningham*, in discussing *Booker*, commented that the Washington sentencing law and the pre-*Booker* federal sentencing guidelines shared the infirmity of being "mandatory and impos[ing] binding requirements on all sentencing judges." *Cunningham*, slip op. at 12. As we noted above, *Cunningham* itself recognized – and even emphasized – that the Washington statute allowed but did not require upward adjustment of a sentence, and yet, despite that the pre-*Booker* federal sentencing guidelines required upward adjustment of a sentence when factual bases were present, the High Court thought the two schemes had a common infirmity of being mandatory and binding. We suspect, then, that the use of the terms "mandatory" and "binding requirements" in *Booker* and *Cunningham* signify only that a sentencing court is *not authorized* to increase the sentence above the standard or baseline unless specified factual bases are present, not that the increase itself is mandated when the bases are present. In this vein, we note that the *Cunningham* Court likened the California statute to the other two analyzed sentencing regimes in that California Penal Code section 1170(b) provided that the sentencing court "'*shall order* imposition of the *middle* term' absent 'circumstances in aggravation or mitigation of the crime.'" *Id.*, slip op. at 12 n.10 (first emphasis in *Cunningham*; second emphasis added). The Court focused upon California's mandate to impose the middle term of sentencing – and not upon the grounds for imposing the upper term, and yet it likened section 1170(b) to the problematic features of the Washington and federal sentencing regimes, which it had termed mandatory in *Booker*. Still, the High Court's continued parlance of "mandatory and binding requirements" as the root of evil for Sixth Amendment purposes gives us pause.

Second, the concept of employing a statutory sentencing range for discretionary sentencing, mentioned in *Booker* and *Gomez* as a marker for constitutionally permissible judge-sentencing, possibly received some affirmation in *Cunningham. See Booker*, 543 U.S. at 233, 125 S. Ct. at 750 ("For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant."). The *Cunningham* Court said that the California sentencing scheme did not resemble the "advisory system the *Booker* Court had in view" because California's judges were "not free to exercise their 'discretion to select a specific sentence within a defined range.'" *Cunningham*, slip op. at 19. The Court referred to California's "sentencing triads, three fixed sentences with no ranges between them." *Id.* "Cunningham's sentencing judge," the Court explained, "had no discretion to

select a sentence within a range of 6 to 16 years. His instruction was to select 12 years, nothing more or nothing less, unless he found facts allowing the imposition of a sentence of 6 or 16 years." *Id.* Initially, at least, this language juxtaposes the errant California law to the pre-2005 Tennessee sentencing law because, as the *Gomez* court said, the Tennessee law utilizes a "range" concept; once a trial judge discerns a basis for departing from the presumptive sentence, he or she has a choice of sentence length in most offense-class/range brackets. To be sure, the sentencing judge in the present case operated within a range of eight to 12 years. Arguably, *Cunningham*'s affirmation of an indeterminate range concept gives a nod to the pre-2005 Tennessee sentencing law.

Again, however, we suspect that the United States Supreme Court had something else in mind. Although Tennessee's pre-2005 sentencing regime utilized an indeterminate range concept, a sentencing adjudication could not even enter the range of indeterminate options *unless and until* the judge made factual findings that ousted the sentence from an inertial determinate point – the presumptive sentence. In other words, it may well be the case that Tennessee's erstwhile presumptive sentence scheme was just as determinate as Washington's scheme – because the sentence was fixed by statute in the absence of fact-finding not embraced in the jury's verdict – and just as mandatory, as well – because the judge was not authorized to depart from the presumptive sentence unless he or she found certain facts not embraced in the jury's verdict.

That said, *Cunningham*'s locutions of "mandatory" and "range" will be viewed by some, perhaps even the appellee in the present case, as supporting *Gomez*'s view of *Booker* and *Blakely*.[30] Thus, arguably some ambiguity is yet afoot. Moreover, the California sentencing law is not a mirror image of Tennessee's. We are mindful that the United States Supreme Court has not *adjudicated* Tennessee' pre-2005 sentencing law; Tennessee's supreme court has. For these reasons, we feel constrained at this juncture to follow the precedent established by the Tennessee Supreme Court in *Gomez.* We fully recognize that the United States Supreme Court is the authoritative and final arbiter of the interpretation and scope of federal constitutional provisions. *See Cunningham*, slip op. at 21 n.16. We also know that, apart from questions of application of the federal constitution or federal statutes, the Tennessee Supreme Court is the final arbiter of state-law issues. *See*, *e.g.*, *State v. Hayes*, 188 S.W.3d 505, 513 (Tenn. 2006) (commenting that the Tennessee Supreme Court is "the final arbiter of the Tennessee Constitution"); *Anthony Tigg v. Pirelli Tire Corp.*, No. M2003-02118-COA-R3-CV, slip op. at 5 (Tenn. Ct. App., Nashville, Dec. 22, 2005) (acknowledging Tennessee Supreme Court as the final arbiter of Tennessee judicial policy). Thus, *Gomez* authoritatively determined the state-law meaning of the then-existing Tennessee sentencing law, even if the United States Supreme Court or the Tennessee Supreme Court yet decides that the Tennessee law, as so interpreted, does not satisfy the rigors of the federal Sixth Amendment.[31]

---

[30] We are aware that, in *Gomez*, the State of Tennessee had conceded that "the defendants' sentences were imposed in violation of the Sixth Amendment right to a jury trial." *Gomez*, 163 S.W.3d at 654. The *Gomez* court rejected the concession. *Id.* at 661-62.

[31] A petition for a writ of *certiorari* in *Gomez* is pending in the United States Supreme Court. *See State v. Gomez*, 74 U.S.L.W. 3131 (Aug. 15, 2005) (No. 05-296).

Thus we decline to modify the length of any of the present defendant's sentences.

Next, the defendant contends that the trial judge should not have consecutively aligned the sentences because the defendant's conduct did not reasonably relate to the severity of the offenses involved.

Tennessee Code Annotated section 40-35-115(b) enumerates factual bases which authorize consecutive sentencing. In the present case, the consecutive sentencing factor upon which the trial court relied is as follows:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

T.C.A. § 40-35-115(b)(5) (2003). In the absence of this or some other authorizing factor, state law requires the imposition of concurrent sentencing. *Id*. § 40-35-115(d).

In the present case, factual bases exist which authorize some measure of consecutive sentencing. *See State v. Cleander Cleon Hartman*, No. M2000-02441-CCA-R3-CD, slip op. at 18 (Tenn. Crim. App., Nashville, Jan. 17, 2002) (concluding that when consecutive sentencing is permissible under section 40-35-115(b)(5), the sentence must also "reasonably relate[] to the severity of the offenses involved") (quoting *State v. Taylor*, 739 S.W.2d 227, 230 (Tenn. 1987)); *cf. State v. James M. Powers*, No. E2001-02363-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Knoxville, Oct. 23, 2002) (holding that section 40-35-115(b)(5) does not apply because "[t]here was no significant time span of undetected sexual activity and the nature of the criminal conduct was not aggravated beyond what is inherent in sex crimes committed against children"); *State v. Robert H. McCurdy*, No. 03C01-9706-CR-00232, slip op. at 10-11 (Tenn. Crim. App., Knoxville, Mar. 23, 1998) (holding because "[t]here was no significant time span of undetected sexual activity, the nature of the criminal conduct was nonaggravated, and the extent of residual damage to the victim caused by the conduct was not demonstrated by evidence presented at trial," consecutive sentencing was not appropriate). However, even though the conduct of the defendant in the instant case was reprehensible, and although we neither discount the seriousness of crimes of this nature nor the trauma suffered by the victim in this case, we believe the present circumstances militate against unfettered consecutive sentencing. *See Cleander Cleon Hartman*, slip op. at 18.

As we decided in *State v. Cleander Cleon Hartman*, our inquiry must include whether the effective sentence is reasonably related to the severity of the offenses. *Cleander Cleon Hartman*, slip op. at 18 (citing *State v. Taylor*, 739 S.W.2d 227, 230 (Tenn. 1987)); *see* T.C.A. §§ 40-35-102(1), -103(2) (2003). Again, we have not disregarded the trauma suffered by B.R., but

given all the circumstances presented in this case, a combination of concurrent and consecutive sentences is appropriate in relation to the severity of the offenses and are the least severe measures necessary to deter the defendant's future criminal conduct, to protect society, and to deter others who are similarly situated and may be likely to commit similar offenses. *See* T.C.A. §§ 40-35-102(1), -103(2) (2003); *Taylor*, 739 S.W.2d at 230.

Thus, the defendant's 12-year sentences for the aggravated sexual battery convictions in counts one, four, five, six, and seven are to be served concurrently with each other and concurrently with the 12-year sentence for the aggravated sexual battery conviction in count two.[32] The 12-year sentence in count three and the 12-year sentence for the especially aggravated sexual exploitation of a minor conviction in count eight shall be served consecutively to each other and to the sentence in count two. Thus, the defendant's effective sentence will be 36 years.[33]

Last, the defendant complains that the length and service manner were illegal because the court failed to require the State to produce the "raw data" upon which the State's expert relied. The defendant further argues that the raw data was necessary for the defense expert to review and rebut the State's proof. Moreover, the defendant complains that he was deprived of the opportunity to cross-examine the State's expert at the sentencing hearing regarding her report. He also complains that the judge's refusal to order the disclosure of the raw data violated Tennessee Rules of Criminal Procedure 16(a)(1)(A) and 26.2,[34] *see* Tenn. R. Crim. P. 16(a)(1)(A), 26.2, and Tennessee Rule of Evidence 705, *see* Tenn. R. Evid. 705.

There is no constitutional right to general discovery in a criminal case. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S. Ct. 989 (1987); *Weatherford v. Bursey*, 429 U.S. 545, 97 S. Ct. 837 (1977). The State is not obliged to make an investigation or to gather evidence for the defendant. *See State v. Reynolds*, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984). The discovery rules do not require disclosure of information not known by the State. Tenn. R. Crim. P. 16(a). Rule 16 permits the defendant to discover any statements made by him, his prior record, documents and tangible objects, and reports of tests and examinations, but only to the extent that the information is in the "possession, custody, or control of the state." *Id.*; *see also State v. Martin*, 634 S.W.2d 639 (Tenn. Crim. App. 1982) (Rule 16 does not provide for the discovery of

---

[32] These count numbers refer to the State's Bill of Particulars and the State's Election as utilized earlier in this opinion.

[33] As explained, our revision of the effective sentence is based upon a statutory mandate to fashion a proportionate sentence. Should a court, upon further review, determine that the lengths of the defendant's sentences violate the Sixth Amendment, the configuration of consecutive sentencing should be adjusted appropriately.

[34] The defendant initially requested the raw data prior to the sentencing hearing under Rule 16. At the sentencing hearing he first requested the data, according to the defendant's brief, via subpoena, *see* Tenn. R. Crim. P. 17, and then he again requested the data be disclosed after the State's expert's testimony, *see* Tenn. R. Crim. P. 26.2. On appeal, the defendant does not argue that he was entitled to the data under Rule 16 subsection (a)(1)(B), defendant's written or recorded statements, nor under subsection (a)(1)(G), reports of examinations and tests. *See* Tenn. R. Crim. P. 16 (a)(1)(B), (G).

prosecution witnesses).  Subsection 16(a)(1)(A) requires the State, upon the defendant's request, to disclose "the substance of any . . . oral statements made before or after arrest in response to interrogation by any person the defendant knew was a law-enforcement officer if the state intends to offer the statement in evidence at the trial."  *See* Tenn. R. Crim. P. 16(a)(1)(A).  In addition, the rule provides that if a party fails to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.  Tenn. R. Crim. P. 16(d)(2).

Tennessee Rule of Criminal Procedure 26.2 requires the party who called a witness other than the defendant, upon motion of the opposing party, to produce any pretrial statements of the witness to the party against whom the witness was called prior to commencement of cross-examination.  Tenn. R. Crim. P. 26.2.

Tennessee Rule of Evidence 705 states that an expert "may testify in terms of opinion or inference and give reasons without prior disclosure of the underlying facts or data, unless the court requires otherwise.  The expert may in any event be required to disclose the underlying facts or data on cross-examination."

Rule 16 does not apply to mandate disclosure of the defendant's oral statements to Dr. Moore because the State's expert, Dr. Moore, is not a "person the defendant knew [to be] a law-enforcement officer."  *See* Tenn. R. Crim. P. 16(a)(1)(A).  In addition, Rule 26.2 does not apply in this case because the statement the defendant sought was not a "statement of the witness," Dr. Moore, but the defendant's own statement.  *See* Tenn. R. Crim. P. 26.2.

In *State v. Henry Eugene Hodges*, No. 01-C-01-9212-CR-00382 (Tenn. Crim. App., Nashville, May 18, 1995), the State sought the clinical notes of the defendant's expert.  *Id*.  The court noted that "the trial court has the discretion to require that the underlying facts and data used by the expert to formulate the opinions be provided to the other party."  *Id*. slip op. at 25 (citing Tenn. R. Evid. 705).  The court further stated that,

> [a]s a general rule, a trial court will require disclosure of the underlying data of the expert's opinion when the court 'believes that the party opponent will be unable to cross-examine effectively and the reason for such inability is other than the prejudicial nature of such facts or data . . . .

*Id*. (quoting Moore's Federal Practice § 705.10 at VII-73).  The court then held that the trial court did not abuse its discretion in requiring the defendant to produce his expert's clinical notes because it would have been "extremely difficult, if not impossible, for the assistant district attorney general to cross-examine [the defense expert] without access to the notes."  *Id.*

-63-

Initially, we note that the interests of justice are better served in these situations when the court at least reviews the requested materials *in camera*. Then, after exercising its discretion in deciding the issue, the court could place the materials under seal, if necessary, for purposes of facilitating appellate review.

In the present case, the raw data were not placed under seal for us to review, despite the defendant's request at the sentencing hearing, and thus, we cannot decide whether the trial court abused its discretion. Regardless whether the court abused its discretion at present, we hold that any such error is harmless. *See* Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). First, the proof showed that the defense expert was very familiar with these tests and even performed some of the same tests on the defendant, upon which he based his opinion. Furthermore, Dr. Moore testified to the testing procedures she performed and to the form of the raw results on certain tests. The defendant had ample information to adequately cross-examine Dr. Moore regarding her opinion's underlying facts and data without being provided with the actual raw data. Second, as the State correctly notes in its brief, the trial court did not rely on the State's expert's report in reaching the sentencing determination.

In sum, the defendant was not entitled to the raw data under Tennessee Rules of Criminal Procedure 16 and 26.2 nor Tennessee Rule of Evidence 705. Moreover, any error in not disclosing the raw data was harmless. *See* Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

## XII. CONCLUSION

The defendant's effective sentence shall be modified to 36 years, but the defendant's convictions and sentences are otherwise affirmed. The State is barred from proceeding further on the three counts of child rape, and those charges are dismissed. The judge who presided at trial is disqualified from conducting further proceedings in this cause.

_____
JAMES CURWOOD WITT, JR., JUDGE